(No. 16487.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FLOYD WILLIAMS, Plaintiff in Error.

*Opinion filed April 24, 1925.*

1. CRIMINAL LAW—*what is improper cross-examination on the question of reputation.*   Witnesses who testify as to the defendant's reputation as a peaceable citizen should not be asked, upon cross-examination, what the people in the defendant's neighborhood said about him after the commission of the homicide for which he is on trial, and should not be allowed to state what they heard after the homicide about another crime which the defendant was said to have committed.

2. SAME—*what evidence of another crime is not admissible in trial for murder.*   In a trial for murder a witness should not be allowed to testify that his house had been burglarized the night before the homicide and that a revolver was stolen therefrom, and that the revolver taken from defendant, and with which the homicide was committed, belonged to the witness, where the burglary was not connected with the homicide and the only question in the case was whether the crime was murder or manslaughter.

3. SAME—*when conviction of murder must be reversed for errors on trial.*   Where there is a reasonable doubt as to whether the defendant was guilty of murder or of manslaughter under the evidence in the record, a conviction of murder imposing the death penalty will be reversed for errors in the admission of evidence and the giving of instructions which might not have required a reversal had the verdict been the only one which the jury could reasonably have arrived at.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. LOUIS BERNREUTER, Judge, presiding.

LESLIE R. ALLISON, and E. W. KREITNER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, H. C. LIN-DAUER, State's Attorney, VIRGIL L. BLANDING, and CHARLES F. MANSFIELD, (ARTHUR W. PETH, and E. A. SCHROEDER, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Floyd Williams was convicted in the circuit court of St. Clair county of the murder of Henry Bodendieck and sentenced to be hanged. This court granted a writ of error, which operated as a *supersedeas,* to review the judgment.

Bodendieck was a plain clothes police officer belonging to the "night-rider squad," and the night of April 3, 1924, he and his "buddy," officer Cashel, went into the Liberty Candy Kitchen, in East St. Louis, about nine o'clock at night. Officer O'Brien remained outside. The officers did not know defendant, Williams, but Cashel and O'Brien testified the police department had been informed he had been engaged in some robberies and had also been informed he frequented the locality they were in. When officers Bodendieck and Cashel went into the candy kitchen the former walked up and stood near the counter and Cashel went to the rear of the store to telephone the police station. Bodendieck had a riot gun in his hand, which was described as a repeating shot-gun with a sawed-off barrel. Cashel said when he first called for the police station the line was busy, and he stood by the telephone a minute, waiting to get the line. Defendant and a companion, Rial, came in the room and took seats provided for customers. Cashel saw Bodendieck walk over to where defendant and Rial were seated and heard him ask, "What is your name?" and immediately heard a shot. He dropped the telephone, ran to where the

men were, and just as he reached them another shot was fired. Defendant had a gun in his hand. Cashel hit him over the head with the butt of his revolver seven or eight times to make him drop the gun but he did not drop it. He then grabbed defendant with his left hand and tripped him, and as they were falling to the floor officer O'Brien came running in and hit defendant. While Cashel and defendant were on the floor defendant got his gun loose from Cashel's grip and put it against his stomach. Cashel caught defendant's hand, turned the gun toward the floor and wedged the fleshy part of his hand between the plunger and cartridge. He finally succeeded in taking the gun from defendant, and it was exhibited at the trial. There were two cartridges in it which had been fired and ten rounds of ammunition were found on defendant.

Officer O'Brien, of the night-rider squad, testified they were looking for defendant on account of information they had received. Before O'Brien entered the candy kitchen he was told by a bystander defendant had just entered it with a man named Rial. Just as he was entering he heard a shot. Before the shot was fired he saw Bodendieck at the entrance to the seats, which he called "booths," where defendant and Rial were. Bodendieck held his riot gun in his left hand, at his side, with the muzzle down. He was in that position when the shot was fired. Cashel ran to where the men were, and another shot was fired. Witness ran to them and he and Cashel struggled with defendant. Witness struck him, and Cashel finally wrested the gun from defendant and they let him get up.

Rial testified that he and defendant went into the candy kitchen, sat at a booth and ordered a drink. He saw Bodendieck standing at the serving counter with a riot gun in his hand. Cashel was using the telephone in the rear of the store. Bodendieck came over to where witness and defendant were. He told defendant he had been looking for him; to stand up—he wanted to search him. He had

316—37

the riot gun down at his side. When Bodendieck said he wanted to search defendant witness jumped out of the booth. Bodendieck reached for defendant and defendant started firing. Bodendieck was starting into the booth. Defendant had a gun in his belt, under a sweater. He fired twice in succession. Bodendieck had not touched him. They scuffled, and Cashel ran in and hit defendant on the head. Witness did not see defendant point a gun at Cashel. Witness knew Bodendieck was an officer. Defendant did not indicate he knew Bodendieck and Cashel were officers. They had been coming there nearly every night. Bodendieck was not in uniform and did not have a star outside his coat. Witness testified he could see the "print" of a gun through defendant's sweater.

On behalf of defendant, Guy Bronk testified he had known defendant and lived in his neighborhood ten years; that prior to the homicide his reputation as a peaceable and orderly citizen was good. On cross-examination the State's attorney asked the witness if he did not know it was a fact that on March 9 defendant entered and burglarized a building. Defendant's counsel objected and the question was not answered. The State's attorney then asked the witness if he had not heard the people in the community in which he lived say defendant burglarized numerous homes and business places. The court overruled an objection, and the witness answered he never did until after this trouble came up. Defendant's counsel objected to his stating what he had heard after April 3 and moved the answer be stricken, but the court overruled the motion and held the witness might state what he heard after April 3 about things which were supposed to have happened before that date.

Richard Avery testified to defendant's good reputation prior to April 3. On cross-examination the State's attorney asked the witness if he had not heard what defendant did about two weeks before the shooting. Objection was overruled, and he answered he had not. The witness was

asked if he never heard of defendant committing any burglaries, and answered he never did till after the murder.

Defendant testified in his own behalf that he went to the candy kitchen on April 3 with Rial about nine o'clock. They sat down in the middle booth and ordered coffee. A man was standing at the counter but defendant paid no attention to him. Defendant said he was reading the menu card when the man walked over and spoke to Rial. He asked defendant his name, and defendant said it was Williams. He did not see the man's riot gun. The man asked defendant what his first name was, and he told him it was Floyd. The man then said, "Come out; I want you." Defendant said the man did not show any authority and defendant did not know what he meant. When he told defendant to come out the man stepped forward, put one foot in the booth, swung the riot gun up over the table and put his left hand under the barrel. Then defendant fired at his right shoulder to stop him. The man did not have a star and defendant did not know him. Defendant did not know Cashel. There was a man in the rear of the store, but defendant did not know who he was or what he was doing. The·man kept coming after the defendant fired, and they clinched, and defendant fired another shot. Someone hit defendant on the head and dazed him. He remembered nothing after that till he fell to the floor and O'Brien had an automatic gun stuck in his face. Defendant testified that the gun he had the night of the homicide belonged to George Galloway.

Defendant's counsel contend that the proof does not show, beyond reasonable doubt, the killing was murder; that at most it could only be manslaughter; that the court erred in the rulings on the testimony, in giving and refusing instructions, and in denying the motion for a new trial.

The proof showed, beyond reasonable doubt, that the killing was not justifiable homicide. Indeed, we do not understand counsel to claim that it was. On the merits of the

case counsel's position is that deceased was killed while attempting to arrest defendant; that defendant was sitting peaceably at a refreshment table in the candy kitchen; that deceased had no warrant for his arrest; that he had on plain clothes, with no star visible, and defendant did not know who he was and did not know he was an officer; that deceased was attempting unlawfully to arrest defendant, and the killing under those circumstances is manslaughter.

Great reliance is placed upon the decision in *Rafferty* v. *People,* 69 Ill. 111. In that case a policeman was killed by the defendant while resisting arrest. There was no proof of express malice toward the deceased. The defendant had not been accused or suspected of having committed a felony or misdemeanor. The deceased policeman had no legal warrant for the arrest of the defendant. The court said three things must attend making an arrest: The person making the arrest must have legal authority, the authority must be executed in a legal manner, and the person arrested must have knowledge of that authority. If an officer having authority to make an arrest is resisted and killed in the proper exercise of his authority the homicide will be murder. The court further held that if an officer having no warrant for the arrest of a man is resisted and killed, the homicide will be manslaughter, only. The court reversed the conviction and remanded the case for another trial. The defendant was again convicted of murder, and this court affirmed the conviction because it was proved on the second trial that the defendant was actuated by previous or express malice, and said, when that is proved the killing is murder notwithstanding the illegality of the attempted arrest. *Rafferty* v. *People,* 72 Ill. 37.

In *People* v. *Bissett,* 246 Ill. 516, a policeman in plain clothes was killed by the defendant. The parties met in a saloon, the policeman caught the defendant and said he wanted what he had in his pocket. The policeman had no warrant, and the court said there was no evidence the de-

fendant had committed any crime unless he was carrying a concealed weapon, and there was no evidence the defendant knew the deceased was an officer. While the men were engaged in a struggle a shot was fired which killed the policeman. The defendant was convicted of murder. The court reversed the conviction and held the defendant was not guilty of any graver crime than manslaughter.

The evidence in *People* v. *Johnson,* 286 Ill. 108, clearly distinguishes it from the *Rafferty* and *Bissett cases,* both of which are cited in the opinion.

In the case we are considering there was no proof of any previous or express malice on the part of defendant toward deceased or toward police officers as a class. Defendant testified he did not know deceased. That is uncontradicted and appears to be so, for the proof shows when deceased approached he asked defendant his name. True, the evidence showed reports had come to the police officers that defendant had committed robberies and the officers were looking for him, but it is not claimed any warrant had been issued for his arrest, and there is no evidence there was any reliable information given the police, but the information they had, so far as the proof shows, was suspicion, and no proof was introduced showing defendant had any information that the police were looking for him.

In permitting the cross-examination by the State's attorney of defendant's witnesses above set out the court erred. (*People* v. *Willy,* 301 Ill. 307.) The error cannot be said to be an immaterial one. The proof is convincing that defendant is not a good man, but he has certain legal rights which cannot be disregarded for that reason. The proof, upon cross-examination, of what the people in defendant's neighborhood said about him after the homicide should not have been permitted, and its admission was calculated to prejudice him in the estimation of the jury and influence the severity of the verdict. George Sempler, a witness for the People, was asked by the State's attorney

whether his house had been burglarized about April 2, 1924, and over defendant's objection was permitted to testify his place of business was burglarized, that his revolver was stolen, and that the revolver taken from defendant by the officers was his; that it was taken the night his place was robbed. That testimony threw no light upon the question whether defendant was guilty of the crime for which he was being tried. Its effect was naturally to prejudice the jury against defendant in the determination of the case. It should not have been admitted.

We shall not take the instructions up in detail and discuss the complaints made of them. A few of the instructions given for the People have been previously condemned by this court. Counsel for defendant in error in effect admit there were inaccuracies in some instructions given for the People when standing alone, but say technical accuracy is not required provided the instructions as a series fairly present the case to the jury, which it is claimed they did in this case. Errors will not always reverse when the verdict was the only one the jury could reasonably have arrived at, but there is, we think, under the law and the evidence, a reasonable doubt whether a verdict of guilty of murder was justified. Considering that fact in connection with errors committed on the trial and the giving of defendant the extreme penalty for murder, we would be false to our conviction of our duty under the law and the evidence if we affirmed the judgment. It is unfortunate a judgment in a criminal case has to be reversed when the defendant is proved guilty of some crime, but a reviewing court cannot affirm a conviction when prejudicial error has been committed on the trial and when the defendant has been found guilty of a crime which the evidence did not show, beyond reasonable doubt, he committed.

The judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*