(No. 20033.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM DOODY, Plaintiff in Error.

*Opinion filed February 18, 1931—Rehearing denied April 8, 1931.*

ORR, J., dissenting.

WM. SCOTT STEWART, for plaintiff in error,

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, J. J. NEIGER, and JOEL C. FITCH, (EDWARD E. WILSON, GRENVILLE BEARDSLEY, and JOHN HOLMAN, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

William Doody was convicted in the criminal court of Cook county of the murder of Charles Levy and sentenced to death. He has sued out a writ of error.

About 7:30 o'clock in the evening of Saturday, May 25, 1929, James Mikes, a captain of police of the city of Berwyn, called for Charles Levy, who was chief of police, at his home and they made a tour around the city in a Cadillac car, accompanied by sergeants Robert Soldat and Thomas Bartanuk, policemen, and Earl Rathburn, brother-in-law of Levy. About 8:00 o'clock the desk sergeant at the police station received a telephone message that a Buick car was standing on Twenty-first street just west of Clarence avenue, and if an officer was sent over there and lifted the hood up he would find a stolen car. Motorcycle officer Kresler came in and was ordered to go to the place indicated, where there was a suspicious car. The desk sergeant also notified Mikes, who was driving the squad car in which was the chief, and that car was driven to the same place and met there Kresler, who then left. Nobody was in the Buick car. The party in the Cadillac car then drove to Twelfth street and Oak Park avenue, where Soldat had a Hupmobile car, which he got and both cars were driven back to the Buick on Twenty-first street. The Hupmobile, in which were the chief and Soldat, was parked behind the Buick, both cars facing west on the north side of the street. The Buick was opposite the entrance of an apartment house, No. 6637. The Hupmobile was in front of another apartment house further east, No. 6633. Levy remained with Soldat in the Hupmobile, while the Cadillac, containing

Mikes, Bartanuk and Rathburn, was parked, facing north, about 150 feet south of Twenty-first street in an alley intersecting Twenty-first street at a short distance west of the entrance to No. 6637. The ground on the south side of Twenty-first street opposite the two apartment buildings, between the alley and Clarence avenue, was vacant. On the west side of the alley were garages and fences. There were two street lights, about eighteen feet from the ground, on diagonally opposite corners of Twenty-first street and Clarence avenue, and two of the same description similarly located at Twenty-first street and Wesley avenue, the next street west of Clarence avenue. The vestibule of the apartment building at No. 6637 was lighted and two lights were attached to the building just outside the door, about twelve or fifteen feet from the Buick.

This was about 8:45 in the evening. After about twenty minutes two men came to the car and entered it—one from each side. Levy and Soldat immediately got out of their car and went to the Buick. The testimony as to what occurred there is contradictory. Soldat testified that Levy went to the left door of the Buick, while Soldat, with his revolver drawn, went to the right, opened the door with his left hand, pulled back his coat and said, "Police officers; stick them up;" and both men raised their hands. The man nearest to him started to lower his hands, and Soldat struck him over the head with his revolver, saying, "Keep them up or I will drill you!" He ordered the man to get out, and he did so. He then ordered the man to turn his back, put his revolver against the man's back and searched him, finding a loaded .45 Colt automatic in his trousers, which Soldat put in his pocket. He then got the man by the nape of his neck, stooped to search him further, and while he was stooped several shots were fired from the left side of the car and Levy called, "Halt! Halt!" Levy exclaimed, "I got him, Bob," and a fraction of a minute later there was more shooting. Shots came from the vacant lot to the

south and Levy cried out, "Bob, they got me." Soldat saw a figure go through the alley, and when it got about 125 feet from the cross-walk two shots were fired in Soldat's direction from this figure and then somebody fired at it from the squad car. Prior to that no shots had been fired from the alley. Soldat crossed the street and found Levy lying on his back in the parkway with two revolvers in his hands. He was taken to the hospital and was found to have a bullet wound in the abdomen, a little above the waist, which had pierced the liver and lodged in the first lumbar vertebra. He died two days later of peritonitis, the result of this wound. Soldat took the other man to the lockup and returned to the scene and made a search, in which he found a hat lying in the vacant lot, about thirty-five or forty feet south of Twenty-first street, near a hole eighteen or twenty inches deep and eight or ten feet east of the alley. His revolver, a .38 Colt, was not fired that night.

The other man in the car whom Soldat arrested and took to the lockup was Edward Maciejewski, and he was indicted jointly with Doody, but a severance was granted and Doody was tried separately. Maciejewski testified on the trial. He was called by the prosecution and was asked who was with him in the Buick car when he was arrested, and answered that he knew him by the name of Dowdy. To the question, "Is he here in the court room?" he answered, "No, I don't see him." Thereupon the State's attorney stated to the court that he was surprised by the testimony of the witness, giving his reasons, and asked leave to cross-examine. The defendant objected, but the court overruled the objection and permitted the State's attorney to cross-examine. The State's attorney cross-examined Maciejewski in regard to his acquaintance with Dowdy and where the witness had been for some time before his arrest, over numerous objections by the defendant. When the defendant's counsel in his cross-examination asked questions seeking to bring out the witness' version of what occurred at

the time of his arrest and the accompanying circumstances the court sustained objections, stating that counsel for the defense could not ask the witness anything about the shooting on cross-examination. After the close of the People's case and the introduction of the two witnesses called by the defendant counsel for the defendant asked leave to continue his cross-examination of Maciejewski and the court allowed the witness to be called for further cross-examination. His testimony was, that about a minute after he got into the Buick two men came up on the right side of the car, pointed pistols at him and profanely ordered him to get out of the car. One of the men was Soldat, who had one pistol, the other having two. Soldat did not exhibit his star or say anything about being a police officer. Maciejewski got out of the car and Dowdy broke out of the other side and the man with two guns got in front of the car and shot over the hood at Dowdy and the latter fell down. The man with two guns said, "I got him," and ran around the car, and Soldat pushed Maciejewski over and fired two shots through the doors, both of which were swung open. There was a lot of shooting from the south and west, and when the "general shooting" started Soldat grabbed Maciejewski and told him to get down behind the car. He and Soldat got down and stayed there two or three minutes and then got up. The shooting ceased for a minute and the man across the street was hallooing that he was shot and Soldat dragged Maciejewski over there. He told Soldat to help the man, but Soldat instead kept abusing him. Maciejewski further testified that neither he nor Dowdy had any pistols or fired any shots. Doody did not testify.

It is claimed that the evidence was insufficient to prove, beyond a reasonable doubt, that the man at the wheel in the Buick car was Doody, the defendant. In addition to what has been given of his testimony, Soldat testified that as he opened the door the defendant was leaning forward, inserting the key in the ignition lock, that the dashboard

lights were lighted, and as he opened the door the lights in the back of the car flashed up, one in each corner. Maciejewski's account of what occurred was different and the two accounts were contradictory. They cannot both be true, and we cannot say that the jurors were not justified in believing Soldat's statement of what occurred there instead of Maciejewski's, and in believing that there was sufficient light for Soldat to see the occupant of the car and that the circumstances were such as to impress his features on Soldat so vividly as to enable him to recognize and identify him when he was arrested a few weeks later. This is a case where the opportunity to see and to hear the witnesses as they testified gave the jurors a great advantage in determining the weight of their testimony over a reviewing court, which has before it only the cold record. Moreover, Soldat's identification of Doody was corroborated by the testimony of Mrs. Lilian Kahler, at whose home at 5504 West Jackson boulevard the plaintiff in error was living when he was arrested, on August 13, 1929. She testified that the plaintiff in error came to her home on July 9 and under the name of John Mason rented a room from her at $50 a month. About two or three weeks before his arrest a solicitor came to the door with whom Mrs. Kahler talked at the door. When she came back the plaintiff in error asked her who he was. She told him they were only solicitors. He said he thought they were coppers, and if they had been there would have been some shooting, and if there had been any shooting she would have been the first to get it. Mrs. Kahler had known Doody before July 9 and had read the papers and knew that he was accused of the shooting of the chief of police of Berwyn. She talked with him many times while he was rooming at her house. At one time she asked him if he had anything to do with the chief of police of Berwyn, and he said he had to do that; that he did not know that he was the chief of police; that he thought it was a "stick-up," and that he was lying

in the street and this man was shooting at him and he had to shoot or be shot. Upon cross-examination she testified that commissioner Stege had told her that she was subject to prosecution; that she had not been prosecuted and did not know what to expect.

Mrs. Margaret Burke testified that she was living with her husband and her five children at 1215 South Racine avenue and on May 10 rented a room to the plaintiff in error, who gave his name as Wymer, and another man who gave his name as Mason. On May 25 the two roomers went out at about 4:30 in the afternoon. Mrs. Burke was sick, and at about 9:30 that night she heard a noise as if one of her roomers had returned. Dorothy Killeen, her daughter, testified she was sixteen years of age and on the night of May 25 she went to a picture show and returned at 10:00 o'clock. At that time Doody, whom she knew as Wymer, was in the dining room talking to Mrs. Ryan. Doody went into his bed-room and Dorothy to the drug store to make some purchases to be used in the treatment of her mother. Upon her return she stayed up till 12:30 and Wymer did not leave his bed-room during that period. Mrs. Ryan testified that she had been called at 8:30 by a daughter of Mrs. Burke, who told her that Mrs. Burke was pretty sick and asked Mrs. Ryan to come right away. She reached Mrs. Burke's home at 9:30 and found she would need to get some things from a drug store and was herself planning to go for them. Mrs. Burke told her to wait until ten o'clock, when Dorothy would be home and she could go. Doody came in at 9:45. Mrs. Ryan was just going to send Doody to the drug store when Dorothy came in and Doody went to his bed-room. Mrs. Ryan stayed there until 12:30 and Doody did not leave his bed-room while she was there. The evidence of the three, Mrs. Burke, Dorothy and Mrs. Ryan, failed to show that the plaintiff in error was not in Berwyn at the time of the homicide, which occurred at about 9:00 o'clock. For any-

thing appearing to the contrary, the plaintiff in error might well have taken part in the homicide and have returned to 1215 South Racine avenue at 9:45 o'clock. The testimony of Mrs. Ryan and Dorothy therefore did not tend to discredit Soldat's or strengthen Maciejewski's testimony. From a consideration of all the testimony as to the identification of the plaintiff in error we are of the opinion that the evidence was sufficient to justify the conclusion reached by the jury.

It is contended that the evidence did not show that the bullet which struck Levy was fired by Doody. No evidence was presented to show that it would not fit any weapon of those fired by the policemen. There was no testimony to show whether Levy's clothes were powder-burned or whether the Buick or other object was struck by bullets. No dying statement made by him was offered in evidence. Soldat alone of the police was near enough to testify as to the start of the affray. The other policemen, because of their distance from the place and the darkness, were only able to see the flashes and hear the reports. As the shots were fired on the left side of the car there was a cry or scream and it seemed as if somebody had started to run across the street. Levy cried, "Halt! Halt!" and then exclaimed, "I got him, Bob." After a few seconds shots came from the vacant ground south of the street, after which Levy exclaimed, "Bob, they got me." Soldat then saw a figure go through the alley, and when the figure got about 125 feet from the cross-walk of the alley two shots were fired from it toward Soldat. At this time Bartanuk had left the police car in the alley and gone to a drug store, leaving Rathburn and Mikes in the car. Rathburn testified that all at once he saw two flashes of fire from a gun and a form running toward the police car. The form hurdled the fence and Mikes shot at it then. Altogether, he said, there must have been eighteen shots fired. Rathburn could not tell exactly who shot or where. Mikes could not tell who

fired the first shot. About eight or ten shots were fired. After the shooting he left the police car and ran about twenty-five feet, when he saw a figure approaching him in the alley. He ran toward the figure, which jumped over the fence. When the figure got in the gangway Mikes fired one shot at it, and the figure fired twice at Mikes and he fired twice at it. According to the testimony of Soldat, Rathburn and Mikes, Soldat alone knew the sequence of the shots which resulted in the cry of Levy, "Bob, they got me." The reasonable conclusion from all the testimony is that Doody sought to escape arrest by running; that Levy fired at him and he cried out as though hit, for Levy exclaimed, "Bob, I got him;" that Levy started toward Doody and followed him across the street, when Doody fired the fusillade of shots which Soldat testified came from the vacant lot and Levy exclaimed, "Bob, they got me." Levy probably was shot in the parkway on the south side of the street and fell there instantly, for the bullet lodged in his spinal column. Following that, the men in the police car saw the running figure and the further exchange of shots occurred. No one was concerned in the shooting except Levy, Doody and Mikes, and Mikes did not shoot until after Levy was wounded and the running figure (Doody) was in the alley. This view of the evidence is in accord, except in one particular, with Doody's own account which he gave to Lilian Kahler. He told her he was being shot at as he lay in the street and shot in return to save his own life. As the testimony of the witnesses indicates, he was shot at as he ran, and it may be he fell or stumbled as if wounded, and as Levy advanced under the impression that he had been hit, Doody discharged a fusillade of shots, one of which struck Levy. It is not surprising that Doody's story to Lilian Kahler may have varied from the truth in an effort to put the matter in a light as favorable to him as possible. It was the province of the jury to decide what was the truth of the matter, and as the evidence justified

the conclusion that the shot which struck Levy was fired by Doody under circumstances which did not justify him in shooting, we cannot set aside the verdict on the ground that the fatal shot was not fired by the plaintiff in error.

It is contended that Levy and Soldat were attempting to make an unlawful arrest and therefore Doody was justified in resisting with such force as was necessary to make the resistance effectual. Neither Levy nor any of the officers in the squad had any warrant for the arrest of Doody or Maciejewski. The circumstances which authorize an arrest without a warrant are declared by section 4 of division 6 of the Criminal Code, as follows: "An arrest may be made by an officer or by a private person without warrant, for a criminal offense committed or attempted in his presence, and by an officer, when a criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it." This section has had the consideration of the court in numerous cases. It needs no construction and it has always been enforced according to its terms. An officer making an arrest without a warrant and without the authority conferred by statute to arrest without a warrant is a trespasser and the person whom he attempts to arrest may resist with all the force necessary to repel his efforts (*North* v. *People,* 139 Ill. 81; *Rafferty* v. *People,* 72 id. 37; *People* v. *Scalisi,* 324 id. 131; *People* v. *McGurn,* 341 id. 632.) On the other hand, when a criminal offense has in fact been committed and an officer has reasonable grounds for believing that the person to be arrested had committed the offense, he is expressly authorized to arrest that person without a warrant and his authority is the same as if he held a warrant commanding him to make the arrest. (*Cahill* v. *People,* 106 Ill. 621; *Lynn* v. *People,* 170 id. 527.) Whether or not the officer had reasonable ground for believing that the person to be arrested had committed the offense is a mixed question of law and fact, the circum-

stances to show it reasonable being the fact and their sufficiency when shown being a question of law. *Kindred* v. *Stitt,* 51 Ill. 401.

It appears that the Buick car was owned by Victor K. Lawson and had been stolen from him on May 7, 1929. On May 25, John Read, a mechanic who had worked on the car, saw it in Berwyn, and, thinking he recognized it, followed it until it was parked. He then telephoned to the Berwyn police station, gave the motor and serial numbers of the stolen Buick and asked the police to see if the parked car was a stolen car. The desk sergeant at the station wrote the message down at the time, and later, when Captain Mikes called the station, gave him the message. No general rule applicable to every case has been, or probably can be, announced as to what facts will constitute justification in law for an arrest without a warrant, other than that such grounds of suspicion exist as should influence the conduct of a prudent and cautious man under the circumstances. Each case must be considered upon its own facts. In *People* v. *Johnson,* 286 Ill. 108, a burglary had been committed a few hours previously in the neighborhood of the homicide, and a police officer, Corcoran, seeing two men carrying a suit-case and basket, approached them to ascertain what they had in the suit-case and basket. One of the men ran away and Corcoran inquired of the plaintiff in error what he had in the basket and started to raise the cover. Johnson, the plaintiff in error, shot and killed the policeman. The suit-case and basket contained articles which had been taken in the burglary, and it was held that the evidence justified the verdict convicting the defendant of murder. In the case of *People* v. *Estes,* 303 Ill. 602, a posse under the leadership of the sheriff, acting upon information that some automobile thieves intended to store a stolen car in a certain shed, went to the shed for the purpose of arresting the thieves if they should appear. Two men drove up in a car without lights, and the sheriff, without disclosing his official

character, ordered them to throw up their hands. Instead of obeying the two men began shooting at the sheriff and a number of shots were exchanged between the posse and the thieves. It was held that the sheriff, though he had no warrant, had authority to make the arrest before the men could get away—had authority to make the arrest of all persons coming there whose conduct and the possession of the car showed that they were the suspected parties. The Buick in question here had, in fact, been stolen, and the officers had reasonable grounds, from the information which they had received, to believe that whoever should claim its possession would probably be the thief who stole it. They would have been careless of their duty had they made an investigation to determine whether the car was stolen or not, for they had no assurance that it would be left where it was parked long enough to permit them to do so. To lift the hood might frighten the thief away. They chose to follow the only course which might result in the punishment of the felon and were justified in attempting to make the arrest.

It is argued that it was error to admit evidence, which was received over the defendant's objection, of other criminal offenses and charges against him: (1) That he had been paroled from the State reformatory at Pontiac, had violated his parole and a warrant for his arrest and return to the reformatory had been issued; (2) that a warrant had been issued by a United States commissioner for his arrest for robbing a postal clerk of money order blanks and passing them; (3) that he had shot postal inspector Jackson at the Hawthorne Arms Hotel on the night of April 22, when Jackson went there looking for Marion Courtney and for persons, other than Doody, who had been passing money order forms stolen from station 40; and (4) that 145,000 circulars containing Doody's picture, front and side views and finger prints, had been circulated throughout the United States and Canada to every first, second and third-

class post-office, to hotels, restaurants, sheriffs and police officers and postal inspectors of the United States. The objection made to all this evidence was that it had no logical connection with or tendency to prove the offense with which the defendant was charged, and that the officers had no knowledge of or connection with the defendant. The answer of the People to this objection is, that the only purpose of introducing this evidence was to show that the defendant was a fugitive from justice evading arrest and therefore had a motive in resisting arrest.

"A man cannot be convicted of crime because he is a bad man generally or has committed other crimes for which he has not been punished, though evidence which tends to prove the offense charged is not objectionable merely because it discloses other offenses, the test of admissibility being the connection of the facts proved with the offense charged.—*Farris* v. *People,* 129 Ill. 521; *People* v. *King,* 276 id. 138; *People* v. *Lane,* 300 id. 422; *People* v. *Hall,* 308 id. 198; *People* v. *Spaulding,* 309 id. 292." (*People* v. *Meisner,* 311 Ill. 40.) "Unless there is some connection between the facts proved and the offense charged it is improper to admit evidence of one crime to prove another." (*People* v. *Richie,* 317 Ill. 551.) "That evidence offered proves or tends to prove an offense other than the one with which the defendant is charged is never a valid objection to its admissibility. When such evidence is offered the same considerations with respect to its admissibility arise as upon the offer of any other evidence. The question is, Is the evidence relevant? Does it tend to prove any fact material to the issue involved?" (*People* v. *Spaulding, supra.*) Thus, evidence which tends to aid in identifying the accused as the person who committed the particular crime under investigation is admissible in spite of the fact that it tends to show the guilt of the accused of other crimes for which he is not on trial. (*People* v. *Mandrell,* 306 Ill. 413; *People* v. *Horn,* 309 id. 23.) So, also, is evidence tending to

show consciousness of guilt or the suppression or destruction of evidence, as flight, concealment, bribery of witnesses, assault upon or murder of witnesses and attempts to break jail or to bribe or kill officers. (*People* v. *Spaulding, supra.*) It was proper in the case we are now considering to show the motive which the plaintiff in error had in attempting to escape the arrest which was impending by shooting the officer who was making the arrest, for the presence of a motive which would lead him to commit the act charged is important in the consideration of the question whether he committed it, and it is always proper for the People to prove motive when it can be done though it is not necessary where a deliberate criminal act is established. (*People* v. *Zammuto,* 280 Ill. 225; *People* v. *Watkins,* 309 id. 318.) Thus, in the trial of a man charged with the murder of a police officer who is attempting to arrest him it is competent to introduce evidence tending to show that he was guilty of burglary, for which he was subject to arrest and prosecution; (*People* v. *Johnson, supra;*) or that he was a fugitive from justice for the robbery of a bank committed ten days before; (*People* v. *Watkins, supra;*) or that he was guilty of the stealing of the automobile in which he was sitting when the officer attempted to arrest him. (*People* v. *Durkin,* 330 Ill. 394.) "The fact that warrants had been issued for the arrest of the defendant for previous crimes may be shown as affecting the motive for killing an officer attempting to arrest the defendant, but proof of the details of such crimes is improper." (*People* v. *Durkin, supra; People* v. *King, supra; People* v. *Spaulding, supra; Moore* v. *United States,* 150 U. S. 57.) The evidence, because of the admission of which complaint is made, all had a tendency to explain why the plaintiff in error might have preferred to kill a police officer seeking to arrest him rather than submit to arrest. It tended to show motive and tended to show guilt of the crime for which he was being tried.

The plaintiff in error makes some other specific complaints against some of the evidence. One complaint is, that the warrant for his arrest and return to the reformatory ought not to have been admitted because it contained an impossible date, was addressed to no named officer and had already served its purpose and was of no more force. The year of its date was 19129—an impossible date. A blank space for the insertion of the officer's name to whom it was directed was unfilled, but the warrant proceeded, "or any sheriff, constable or police officer of any village of the State of Illinois be and he is hereby authorized and commanded to arrest said William Doody," etc. Doody had been arrested on the warrant but had been released to permit him to take advantage of employment which was offered him, upon his promise to appear on April 3, 1929. He had violated this promise, and the warrant, with its imperfections, was delivered to the police department of Chicago and a constant search was maintained for Doody's arrest. That the warrant may have been imperfect or have served its purpose was of no importance in this case, for the object of its admission and the testimony relating to it was to show that the plaintiff in error was being sought for the violation of his parole under color of authority. There is no merit to the further objection to the warrant as evidence that it informed the jury of the crime for which Doody had been sentenced to the reformatory. The warrant tended to prove a motive for the killing of Levy. That it incidentally disclosed that Doody had been convicted of another crime did not make it incompetent. So the testimony that Federal authorities had a warrant for his arrest for an offense against the postal service and had sent circulars so generally throughout the county that the plaintiff in error must have learned from that source that the Federal authorities sought to arrest him, and that he had shot the postal inspector, Jackson, as he stepped into the room at the Hawthorne

Arms Hotel on official business, looking for Marion Courtney for the offense of passing stolen money order forms and he had not been arrested for that offense, all tended to show the motive for resisting an attempted arrest by any police officer, whether of the State, county, city or the Federal government, that Doody was a fugitive from justice and knew it. It is argued that these offenses had no relation to the crime with which he was here charged; that while it may be competent, as in the *Durkin case, supra,* to show a related crime which tends to prove a motive for resisting an officer, the rule was extended too far in this case. In the *Durkin case* the extraneous crime shown was the stealing of the automobile which Durkin was driving when the officer accosted him. In the case of *People* v. *Johnson, supra,* the extraneous crime was the burglary committed in the neighborhood in which the defendant was found in possession of some of the fruits of the burglary. But the reason for the admission of evidence tending to show crimes other than the one for which the defendant is being tried is that such evidence also tends to show motive for resisting arrest, and that being the reason, it is not logical to confine such evidence to crimes immediately connected in time or place with the crime for which defendant is on trial. For the same reason testimony that a defendant was, at the time he resisted arrest, a fugitive from justice for a dozen offenses would tend more strongly to prove motive for resisting arrest than testimony that he was a fugitive from justice for one offense.

When the warrant for violation of parole was offered an objection was made and overruled, the court saying, "I am overruling it on the authority in the *Durkin case,* for the fact the Supreme Court said the warrant issued for the arrest of the defendant may be shown as affecting the motive," to which the plaintiff in error excepted. He now contends that the remark of the court was highly prejudicial, practically telling the jury that the defendant

was guilty. No such prejudicial effect can be attributed to the judge's remark. The citation of authority for his decision was unnecessary but was not harmful and the *Durkin case* does support the ruling. All this evidence of warrants and of other crimes was admitted for the sole purpose of showing motive, but the court gave no instruction to the jury limiting consideration of the evidence introduced to the sole purpose of showing motive to resist arrest. Such evidence was not competent for the purpose of showing authority in Levy to arrest the plaintiff in error, or that the plaintiff in error was a bad man, who, because of his character, would be likely to commit the crime with which he was charged. Its only purpose was to show that he had a motive for committing the crime charged.

The plaintiff in error offered several instructions designed to limit the use of the above evidence by the jury, which were all refused, and counsel contends that the court erred in refusing to give them. Instruction 50 instructed the jury that the warrant for violation of parole had lost its validity and was of no effect. Instructions 51 and 77 told the jury that the Berwyn police had no right to arrest the defendant under the Federal warrant, the warrant for violation of his parole, or because the defendant might have been wanted. There was no claim of any right to arrest under any warrant and therefore no issue on that question. The only claim made was the right to arrest without a warrant. These instructions would only have confused the issue presented and directed the attention to an immaterial question and they were properly refused.

Instructions 49, 81, 82 and 83, however, were correct statements of a rule of law applicable to the facts of the case. Instruction 49 was as follows: "As to the alleged warrant in evidence for violation of parole, you are to leave same out of your consideration entirely in determining whether or not officers Levy and Soldat had a right to arrest the defendant, William Doody, in case you believe

from the evidence beyond a reasonable doubt that he was on the scene at the time and place in question." Instructions 81, 82 and 83 are statements of the same rule with reference to any evidence tending to, respectively, show that the defendant was wanted, the alleged shooting of Jackson, and the alleged Federal warrant.

Instruction 52 went on the theory that Levy had no right to arrest Doody unless Levy had both just cause and a warrant. Instructions 53 and 57 merely stated abstract propositions of law without showing their application to the facts of this case. Instruction 58 told the jury that none of the policemen who attempted to arrest Doody was justified in attempting to do so. All of these instructions were properly refused.

Instruction 25 given at the request of the People is characterized as a "stock instruction on circumstantial evidence." It has often been approved. The objection is made that it should not have been given because there was not sufficient circumstantial evidence upon which to base a conviction, and that it should have stated that circumstantial evidence should exclude every other reasonable hypothesis before guilt can be shown by such evidence. It is not necessary that the circumstantial evidence in a case should alone exclude every other hypothesis than guilt to justify a conviction. Circumstantial evidence may justify a conviction when it is considered with all the evidence in arriving at a verdict. The words "connected with or surrounding the commission of the crime charged" do not assume the commission of a crime but refer to the alleged crime in the indictment. The jurors being men of sound degree of intelligence must be presumed to have known that they were trying the man for murder and that the question of his guilt or innocence which they were to determine was guilt or innocence of the particular murder alleged.

Instruction No. 26 is also said to be a stock instruction on the subject of alibi. It opened with the words, "The

court instructs the jury that where an alibi is relied on as a defense," and it is contended that the defendant was entitled to have such an instruction commence with words indicating that an alibi was only one of the many possible defenses in the case. The alibi, if sustained to the extent required by the instruction, is a complete defense by itself and is neither helped nor hurt by one or many other supposed defenses. The objection to the requirement that the defendant support his alibi not only with facts but with circumstances is fanciful. The facts of the alibi are circumstances of the charge against the defendant which, considered with the other evidence in the case, may create a reasonable doubt of the defendant's guilt. The instruction directed the jury to consider the facts and circumstances "in connection with all the other evidence in the case." The evidence of other crimes, as we have held, the jury should have been instructed to consider on the question of motive only, and the instruction on the alibi, therefore, should not have instructed the jury to consider that evidence.

Instruction 27, on the presumption of innocence, was approved in *People v. Rees,* 268 Ill. 585. It is contended that the instruction might be held by its language, "to prevent an innocent person from being convicted," to have invited the jurors to disregard the presumption of innocence if they did not believe the defendant innocent of the other crimes of which evidence was introduced. Again presuming the jurors to possess some slight degree of intelligence, we cannot believe they could have misunderstood this instruction.

We do not regard the objection to instruction 28 of sufficient weight to justify our setting out the instruction, which concerns the subject of flight and living under an assumed name, or considering in detail the objection. The instruction tells the jury that such flight, if proved, may be considered on the question of the guilt or lack of guilt of the defendant. The argument of counsel on the instruction

goes only to the weight which should be given to the evidence, except as to the claim that the hypothesis that the crime has been proved to have been committed should have contained the expression, beyond a reasonable doubt from the evidence. The court did not err in giving this instruction.

Instruction 29 told the jury that if they believed from the evidence, beyond a reasonable doubt, that the defendant fired the shot which resulted in the injury and death of the deceased, and that the shot was fired by defendant in aid of defendant's escape from a lawful arrest, as defined elsewhere in these instructions, such a shooting would, if proved beyond a reasonable doubt, constitute the crime of murder and not manslaughter. The objection that the instruction assumes that the shot was fired by the defendant is so obviously contrary to the express hypothesis of the instruction that no attention need be paid to it. The instruction, however, was erroneous. It was based on the hypothesis that the shot was fired in aid of the defendant's escape from a legal arrest as defined elsewhere in the instructions. The only instruction on the right to arrest without a warrant was, in the language of the statute, that "an arrest may be made by an officer or by a private person without warrant, for a criminal offense committed or attempted in his presence, and by an officer, when a criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it." Yet while an arrest attempted in such a manner may be lawfully made without a warrant, still it may be that the defendant would have reasonable ground to conclude that but an unlawful assault was intended and not a lawful arrest. The testimony of Maciejewski was that the police officers, without announcing their identity as policemen, assaulted the defendant in such a manner that he might reasonably have concluded their intention was to rob him. The jury might not have believed this testimony,

but it was their province, and not the court's, to determine the credibility of the witnesses. A homicide occurring under such circumstances could be of no higher grade than manslaughter. (*People* v. *Williams,* 316 Ill. 575.) A defendant is entitled to have the jury instructed as to the law applicable to any state of facts which the jury might legitimately find from the evidence. *People* v. *Scalisi, supra; People* v. *Egan,* 331 Ill. 489.

It was error to give instruction 30, which was as follows:

"The court instructs the jury as a matter of law, that in determining whether a killing is justifiable on the ground of self-defense, you should consider all the circumstances attending the killing and immediately previous thereto, and the means used, and the degree of force used by the defendant, if you find from the evidence beyond a reasonable doubt that the defendant, actually did the shooting, as bearing upon the question whether the wound inflicted was inflicted in necessary self-defense or whether it was given in carrying out an unlawful purpose."

This instruction is on the duty of the jury in reference to the right of self-defense, and requires them to consider all the circumstances attending the killing as bearing upon the question whether the wound was inflicted in necessary self-defense or in carrying out an unlawful purpose. Yet the jury were not advised in this instruction or elsewhere what necessary self-defense was, the facts which would justify a resort to self-defense, or the right of the defendant to act upon appearances as they were presented at the time. An instruction purporting to state the law upon necessary self-defense should not be given without defining the term. (*People* v. *Triolo,* 332 Ill. 410.) For the same reason instruction 31 should not have been given.

Instruction 33 was also erroneous. It told the jury that the defendant could not avail himself of the defense of self-defense if he killed the deceased and at the time was

committing an offense against the law. If he shot and killed the deceased he was carrying a concealed weapon when the attempt was made to arrest him. This was an offense against the law, and under the instruction he was deprived of the right of self-defense no matter what the other facts in the case were.

Instruction 34 was sustained in *People* v. *Durkin, supra.* The proposition stated in it is abstract and the instruction might have been refused for that reason, but it did no harm, and the proposition of law stated is correct.

Instructions 36, 38 and 39 are concerned with the question of express malice, and there was no such question in the case. Mrs. Kahler's testimony as to her conversation with the defendant at her house tended to show express malice on his part at that time against police officers generally but there was no evidence of express malice at the time of the homicide, and the jury should not have been instructed as if there were. Instruction 38 has been held erroneous because it ignores the defense of self-defense. (*People* v. *Jarvis,* 306 Ill. 611; *People* v. *Penman,* 271 id. 82.) Instructions 36, 38 and 39 also ignore the possibility that the crime was manslaughter and not murder.

Instruction 67 asked by the defendant consisted of an argumentative preamble on the subject of implied malice, followed by an instruction as to the use of excessive force in resisting an unlawful arrest, and concluding that the killing under the circumstances would not be murder but manslaughter. It was argumentative and obscure and was properly refused.

Levy's police star, and two revolvers which were found in Mrs. Kahler's living room at the time of the defendant's arrest, were admitted in evidence over objection. There was no evidence connecting the weapons with the homicide or tending to show that Levy's star was in sight when he attempted to arrest the defendant. They should not have been admitted in evidence as exhibits.

Other errors have been assigned which do not require consideration. What has been said will be a sufficient guide for a new trial.

The judgment is reversed for the errors in instructing the jury which have been mentioned and the cause is remanded for a new trial. *Reversed and remanded.*

Mr. JUSTICE ORR, dissenting.