People of State of Illinois, Plaintiff-Appellee, v. Harry Wrest and Robert Leu, Defendants-Appellants.

Term No. 51–M–1.

Opinion filed October 30, 1951. Rehearing opinion filed January 18, 1952. Rehearing denied January 18, 1952. Released for publication January 18, 1952.

A. M. FITZGERALD, of Springfield, and G. EDMOND COOK, of Madison, for appellants.

IVAN A. ELLIOTT, State ATTORNEY GENERAL, of Springfield, and AUSTIN LEWIS, State's Attorney of Madison county, of Edwardsville, for appellee; WILLIAM C. WINES, HAROLD G. TALLEY, JAMES C. MURRAY, RAYMOND S. SARNOW, and JOHN T. COBURN, Assistant Attorneys General, all of Chicago, of counsel.

MR. JUSTICE BARDENS delivered the opinion of the court.

On May 12, 1950, Robert C. Winder, Captain of the Illinois State Highway Police, together with Norman Lee, chief investigator for the Department of Criminal Identification of the State of Illinois, aided by other state police, and in possession of a search warrant issued by a justice of the peace of Madison county for the search of the "200 Club" in the City of Madison, made a raid on said club and seized money and property, the material items of which are summarized as follows: Item 1, dice, dice boxes, dice cards, dealing checks, and keys; Item 2, horse-betting wallboard, betting cards, horse-betting tabs, blackjack table and covers, billing machine full of racing tabs; Item 3, adding machines, "lightning cashier," and coin meter; Item 4, money in coin and currency, checks and a fifty-dollar United States Savings Bond. There were other items of property seized, but the same are not of importance to this decision and are not herein classified.

187

A return of the property seized was later made to the justice of the peace, who entered an order impounding the property, and thereafter the county court of Madison county also entered an order impounding the property and ordering the money placed in the custody of Austin Lewis, the state's attorney of said county. The impounding order provided that the property should be kept for use as evidence upon the trial. Thereafter, informations were filed against the two defendants who were the operators of the "200 Club," together with a petition for confiscation and disposition of the property and money seized.

The defendants did not file a motion to suppress the evidence but did, on May 31, 1950, each enter a plea of guilty to operating a bookmaking establishment for horse-race betting. Each was fined the sum of $2,000 upon the charge, which fines were paid in full.

Thereafter, the defendants answered the petition of the state's attorney and attorney general for confiscation and disposition of the property and money seized and petitioned the court to order such property and money restored to them. They set up that they were the owners and in possession of the property when it was seized; that the search and seizure were illegal; that money- is not of such a nature as to be subject to destruction or confiscation; that the other property seized was not shown to have been in illegal use; and that no criminal proceedings were then pending against them. Other and supplemental pleadings were filed. After hearing evidence and considering briefs and arguments, the lower court granted the relief prayed by the state's attorney and attorney general, ordered the monies to be paid to the Common-School-Distributable Fund of Madison county, and ordered the other property destroyed. From that order defendants appeal.

The evidence produced by the people disclosed that Norman Lee had been assigned to investigate horse

book establishments in Madison county; that on May 10, two days before the raid, together with Mr. Brennan, his supervisor, he entered the "200 Club," the door being unlocked. He described the sign on the outside of the building designating the building as the "200 Club," and the interior as containing a small coffee shop and sandwich counter and other counters that ran along the walls, such counters being away from the walls and about four feet high and eighteen to twenty feet long and two feet deep. Behind the counters were wallboards with names of horses, numbers of horses, races, and other writing thereon. The evidence further showed that there were two entrances to the premises, one in the front corner and one in the rear, and that the wallboards ran along the side wall of said building; that the counter was in two sections with an entrance or opening of four to five feet between them; and that in addition to the counters there were two cages described as "cashiers' cages." One of these cages was between the two counters and the other one was at the end. In this main room with the counters and cages were many chairs and some benches which faced the wallboards.

Mr. Lee further described the activities in the room on the 10th of May. He stated that there were approximately 75 people in the room on that date and that patrons were placing bets; that the people placing bets had a racing form and checked with the horses on the wallboard; that they would then go to the counters, place their bet with a man behind the counter on some horse in the race; that they used United States currency; that he saw patrons place money on the counter which was accepted by one of the men behind the counter and placed in a drawer beneath the counter. The bettor then would receive a ticket. Afterwards he saw some patrons go up and lay a ticket in the window of the "cashiers' cage" and receive money from the man in the cage. Mr. Lee made a bet of four dollars

189

himself in the manner indicated. He further testified that he went back to the "club" on May 11 about four o'clock in the afternoon and saw about the same situation and actions as he saw on the previous day.

On May 12th a search warrant was issued by the justice of the peace and directed to Harold Beneze, a constable, but delivered by the justice to an assistant attorney general who in turn delivered the warrant to Captain Winder. A group of about twelve state police participated in the raid, besides Winder and Lee, part of them going in the front and part in the rear door of the club. Both doors were unlocked and open to the public. Captain Winder was in charge of the group that went in the front door and upon entering blew his whistle, announced a raid was in progress, and served the warrant on a man standing behind one of the counters. There were some 175 to 200 people present at the time and the patrons were allowed to go out the back door, but were asked to leave their name and address. The defendant Wrest was present at the time of the raid which was started about three o'clock p. m. A truck was brought to the "club" at about five p. m. and the property in question was loaded upon the truck and taken away. The money that was seized was taken from the drawers under the counters and in the cashiers' cages and was taken to the police station that evening and later on to a bank for safe keeping. The evidence showed the main room of the "club," in addition to counters, cages, wallboards, and chairs, contained betting cards, horse-betting tabs, a "lightning cashier," coin meter, and several adding machines. None of the officers actually saw any bets placed on the day of the raid.

In addition to the main room in the building, there was what was designated as a back room, formed by a partition, in which was the end cashier's cage above referred to. This back room was not open to the

public but was accessible through a doorway which had no door. In this back room were found certain items of property classified under Item 1. In the rear of this back room was another partition behind which was a safe which contained approximately fifteen-thousand dollars but no claim by the people was made as to the money in this safe and it was turned back to the defendants or their attorney.

A stipulation was entered into to the effect that at the time of the seizure the money in question was the property of the defendants. The People proved a number of prior convictions of the defendants on charges of keeping a gaming house. Defendants, however, outside of stipulations, offered no evidence.

Defendants' assignments of error can be summed up substantially as follows: (1) That the search and seizure were illegal; (2) that there is no evidence of illegal use of the property at the time of its seizure; (3) that legal currency and coin of the United States of America can never be contraband and destroyed or confiscated; and (4) that the chattel property is of a legal and inoffensive character and should not be destroyed. With regard to the assignment of error that the search and seizure were illegal, the defendants contend that most of the property taken was not described in the warrant; that the warrant was not served before the seizure or by any constable or sheriff or local police officer; and that the state police were not authorized to serve the warrants.

 In our opinion it is not necessary to treat separately of each of the contentions regarding the seizure because we hold that the seizure was legal upon the basis that the officers had reasonable grounds to believe that a crime was being committed in their presence and that, therefore, they had a right to make an arrest and a consequent search of the immediate premises without any search warrant at all. In the

191

*People v. Dubin,* 367 Ill. 229, where the officers had no search warrant, the court, after reviewing the evidence, found that the officers did have reason to suspect a crime was being committed and held that the search and seizure of the defendant's dental office was not illegal. The court, on page 235, uses the following language:

"They had reason to suspect a misdemeaner was being committed, and, as incident to the arrest, were authorized to search for, and to seize any property pertaining to this crime."

Citing *Marron v. United States,* 275 U. S. 192. In the *People v. Tabet,* 402 Ill. 93, wherein the defendants were convicted of a crime of larceny and complained that they were unlawfully arrested without a warrant and that evidence should have been suppressed because of the unlawful seizure of an automobile and articles found therein, the court affirmed the judgment and used the following language:

"An officer has a right to arrest without a warrant where be has reasonable grounds to believe that the person arrested is guilty of a crime where, in fact, a crime has been committed. *People v. Davies,* 354 Ill. 168; *People v. Doody,* 343 Ill. 194; *People v. Reid,* 336 Ill. 421; *Carroll v. United States,* 267 U. S. 132.

"The guaranty of the constitution is not against all searches and seizures without a warrant but against unreasonable search and seizure and does not extend to an immunity from search and seizure on arrest. (*People v. Barg,* 384 Ill. 172; *People v. Exum,* 382 Ill. 204.) It is our opinion that the arrest without a warrant in this case was justified and proper.

"It has been held that where the arrest without a warrant is justified the accompanying search of the person is also justified (*People v. Exum,* 382 Ill. 204; *People*

*v. Reid,* 336 Ill. 421; *People v. Hord,* 329 Ill. 117) and that where one is legally arrested for an offense, what is found upon his person, or in his control, which it is unlawful for him to have, and which may be used to prove the offense, may be seized and held as evidence in the prosecution. *Carroll v. United States,* 267 U. S. 132; *People v. Brown,* 354 Ill. 480.''

In the recent case of *United States v. Rabinowitz,* 339 U. S. 56, 94 L. Ed. 653, 70 S. Ct. 430, the court held search and seizure lawful wherein the officers searched the defendant's place of business, consisting of a small one-room office, open to the public, because the arresting officers had probable cause to believe that the crime was being committed in their very presence, and held that the search and seizure could go further than searching the defendant's person, and extended to the desk, safe, and file cabinets, all of which were in plain sight of the parties and all of which were located in the defendant's immediate control.

■ As to the contention that state police officers had no authority to make this type of an arrest and seizure, it is sufficient answer to point out that the legislature has designated the authority of the state highway police and in ch. 121, par. 307.16, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 120.255 (16)], uses the following language:

''They are conservators of the peace and as such have all powers possessed by policemen in cities, and sheriffs, except that they may exercise such powers anywhere in this State.''

We come now to the principal question which is argued by both sides in this case, namely, whether or not the property seized was contraband and of such nature as should be destroyed and whether or not lawful currency and money of the United States can ever be contraband or subject to confiscation because of

193

illegal use. Defendants rely strongly on the case of *Kearney v. Webb,* 278 Ill. 17. In that case, Kearney, the plaintiff, had given sixteen-hundred dollars in currency and coins to his three employees to operate three separate crap tables. The evidence showed that plaintiff had legal title and lawful possession of the sixteen-hundred dollars. There had been some gambling but when the money was seized, Kearney's agents had lost about sixty dollars. Kearney sued the state's attorney, into whose custody the money had been put, in an action of assumpsit and filed a declaration containing the common counts. Plaintiff made his case on evidence that the money was his legal property and in his lawful possession when the state's attorney seized it. The court, pointing out that plaintiff could prove his case without relying on any illegal contract, held that the question of illegality was raised only by the defense and constituted no sufficient defense.

In the case at bar there is a plea of guilty and conviction in the records of the case. The evidence shows in detail the manner of conducting the operations of the defendants, to wit: money being bet and placed on counters and put in drawers where it was seized. A reasonable inference from these circumstances is that the money seized was money that had been bet on the races and was kept in the drawers until the winners had been paid. If this inference was not correct or if there were other facts to contradict this inference, it was the duty of the defendants to produce evidence to that effect. The defendants produced no such evidence and this fact gives rise to a presumption against them. *Tepper v. Campo,* 398 Ill. 496. *Belding v. Belding,* 358 Ill. 216. Although the stipulation stated that the money was the property of the defendants, the evidence shows it was not their lawful property and in their lawful possession because it was the stake or fruit

of the illegal operation. The facts in the instant case are distinguishable from *Kearney v. Webb.*

This distinction between the two cases is further emphasized by the fact that approximately fifteen-thousand dollars taken from the safe of the defendants in a rear room of the premises was not claimed by the State. On the contrary, the people entered into a stipulation that the defendants were the *rightful* owners of same.

■ From a review of cases decided in other jurisdictions, as well as in Illinois, we believe the correct rule can properly be stated as follows: If the article seized, be it chattel or money, were being used as an integral part of the gambling transaction or operation, it should be considered as an implement of gambling and declared contraband. 38 C. J. S., Gaming, par. 78. *Fairmount Engine Co. v. Montgomery,* 135 Pa. Super. Ct. 367, 5 A. (2d) 419; *Germania Club v. City of Chicago,* 332 Ill. App. 112; *Dorrell v. Clark,* 90 Mont. 585, 4 P. (2d) 712, 79 A. L. R. 1000; *Rosen v. Superintendent of Police,* 120 Pa. 59, 181 Atl. 797; *Hofferman v. Simmons,* 290 N. Y. 449, 49 N. E. (2d) 523. One of the leading cases is *Rosen v. Superintendent of Police, supra.* This case is cited by the people and the defendants. The opinion does state that ''money is not ordinarily itself an instrumentality of gambling'' and the case does hold that money taken from the appellant's pocket and not found on any gambling table, wheel or other illegal device, machine or apparatus, could not be earmarked or identified as a stake which was being gambled for and, therefore, was not subject to seizure. The court, however, did use the following language:

''Money may, nevertheless, be subject to seizure along with the contraband gambling devices, apparatus, or instrumentalities (*Com. v. Sinn,* 82 Pa. Super. 482, 484; *Com. v. Kaiser,* 80 Pa. Super. 26, 28) when the circum-

stances are such that it is clearly apparent that it formed an integral part of the illegal gambling operation, and being commingled with other such money, had not, previous to the seizure, been reclaimed and taken back into his own possession by the player, nor been received and reduced to the exclusive possession and ownership of the winner, or owner of the gambling device, or proprietor of the gambling establishment. Thus money found in a gambling slot machine, when seized, may be held with the machine and be confiscated by the commonwealth; for while it had passed out of the ownership of the players, who inserted it in the machine, it had not been reduced to the possession and ownership of the proprietor; he does not become the owner of the money while it is contained in a receptacle within the illegal and contraband gambling machine. So money found lying on a roulette wheel, or rouge et noir table, when the gambling device is seized, if lost, may, in like manner be subject to confiscation. *Com. v. Sinn, supra,* 82 Pa. Super. 482, page 484. Money received for lottery tickets and 'policy' slips and from playing 'numbers,' and held awaiting the drawing of the lottery, or the determination of the winning number, if earmarked or segregated so as to be identified as part of the gambling operation, may likewise be confiscated as contraband by the authorities along with the gambling instrumentality. *Appeal of Joe Curcio,* 106 Pa. Super. 53, 161 A. 627. That case illustrates the distinction above made. The money which had been received from the persons who played the 'numbers' game and was being sorted into packages, at the time the place was raided, was properly seized and retained by the police authorities, but other money found in the place, which had been received from the operation of Curcio's billiard tables, and was not identifiable with the illegal lottery, was rightly ordered returned to him.''

196

The reasoning of the quoted language was subsequently used as a basis in three other Pennsylvania cases for sustaining a forfeiture of money that was held to be an integral part of the illegal operation (bookmaking). *Commonwealth v. Friedken,* 158 Pa. Super. Ct. 357, 45 A. (2d) 403 (1946); *Commonwealth v. Petrillo,* 158 Pa. Super. Ct., 354, 45 A. (2d) 404 (1946), and *Commonwealth v. Deavenport,* 158 Pa. Super. Ct., 359, 45 A. (2d) 405 (1946). In *Krug v. Board of Chosen Freeholders of Hudson County,* 3 N. J. S. 22 (1949), 65 A. (2d) 542, the court, after stating that money as such is not ordinarily an instrument of gambling and subject to seizure and confiscation, uses the following language:

"Money may, however, become subject to such seizure where it has become an integral part of the gambling operation. Where money is not found in a gambling device, but was used per se in connection with gambling operations it has been held that such money after seizure is earmarked and segregated and becomes contraband as in itself a gambling device. This principle of law was established in the case of *Kenny v. Wachenfeld,* et al, 184 A. 737, 14 N. J. Misc. 322."

In *Hofferman v. Simmons,* 290 N. Y. 449, 49 N. E. (2d) 523, there was a consolidation of four cases, all brought against the defendant as property clerk of the police department of the City of New York. The actions were in replevin and affidavits were filed that the money represented wagers placed with plaintiffs. The court uses the following language:

"To say that a professional gambler, running a betting room or supervising a squad of policy collectors, can invoke the aid of the courts to get back from the police monies which have been bet with the professional gambler in defiance of the law, is to say that the courts will recognize and protect an outlawed business, and

197

give their sanction to titles and possessory rights founded only on lawbreaking.''

Also:

''It is true that Penal Law sections 977, 978, and 979, authorizing the seizure and destruction of gambling implements, contain no directions as to the disposition of monies seized from gamblers by the police (see, however, Penal Law, #985–a which does deal with the disposition of monies found in slot machines). But the omission from the statutory law of specific rules governing the conduct of police officials with respect to seized monies does not enlarge the rights of professional gamblers. The failure of the Legislature to complete the statutory scheme as to gambling by providing for the ultimate disposition of monies seized from professional gamblers does not make lawful the possession of such monies by such persons or confer on them legal title thereto. 'However, whatever may or may not be done with the money in the custody of the court, the power of our courts, either at law or in equity, cannot be invoked in aid of one showing a violation of the law, to complete the illegal transaction and secure to the violator the fruits of his outlawry.' *Dorrell v. Clark,* 90 Mont. 585, 592, 4 P. 2d 712, 714, 79 A. L. R. 1000.''

What we have said disposes of the contentions with regard to the money and property seized and shown to have been an integral part of the gambling transactions. However, the property heretofore listed in this opinion under Item 1 and the chattels listed under Item 3 are not property declared illegal *per se* and there was no showing of their use in any gambling operations. Therefore, the court erred in ordering this property destroyed.

The order of the lower court will be affirmed as to the property classified under Items 2 and 4 and in other respects the order will be reversed and the cause re-

manded with directions to the lower court to order the return to the defendants-appellants of all the property except that classified in Items 2 and 4 of this opinion.

*Affirmed in part and reversed in part and remanded with directions.*

CULBERTSON, P. J. and SCHEINEMAN, J., concur.