2023 IL App (2d) 220115-U
No. 2-22-0115
Order filed January 31, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF DEERFIELD, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-OV-497 |
| | ) | |
| LAURA K. MERTEN, | ) | Honorable |
| | ) | Bolling W. Haxall, III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court's order finding defendant guilty of violating a local ordinance is affirmed.

¶ 2    On June 4, 2021, plaintiff, the Village of Deerfield, charged defendant, Laura K. Merten, with criminal damage to property in violation of a local ordinance. After a bench trial, the court found that defendant committed the violation and sentenced her to six months' probation, 40 hours of community service, and $500 in fines and fees. Defendant appeals. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Charges and Trial

¶ 5    On June 4, 2021, the Village police department issued to defendant a non-traffic complaint and notice to appear, charging her with criminal damage to property in violation of Deerfield's Municipal Code (Municipal Code) section 15-29.1, in that she,

> "knowingly hired Advanced Tree Care to enter upon the property at 370 Shenandoah Court and remove approximately 20 Buckthorn plants covering approximately 85 feet of the property line, causing damage to said property, which is owned by the beneficiaries of the Pauline Tanzillo Trust."

¶ 6    On February 1, 2022, the court held a trial. With minor stylistic exceptions, the following facts from trial are adopted virtually verbatim from the certified bystander's report submitted on appeal pursuant to Illinois Supreme Court Rule 323(c) (eff. July 1, 2017).

¶ 7    At trial, Michael Bramucci, owner and operator of Advanced Tree Care ("ATC"), testified that, since approximately 2015, defendant had been an ATC customer. Bramucci stated that defendant lived at 380 Shenandoah Court, Deerfield. The Village admitted Village exhibit No. 1, which Bramucci identified as a series of proposals or work orders for maintenance that ATC had completed for defendant. The orders were dated September 8, 2016, October 10, 2018, October 13, 2019, October 18, 2020, and March 3, 2021.

¶ 8    Bramucci testified that, beginning in approximately 2016 or 2017, defendant hired ATC to complete several projects, including trimming back buckthorn from her neighbor's property that encroached onto defendant's property. However, because the work was expensive and defendant did not want to pay for all of it at once, the project extended over multiple years. Bramucci said that it was possible to cut back the neighbor's buckthorn to the property line, so long as the trees themselves were not damaged. According to Bramucci, ATC had to trim back the neighbor's

buckthorn to the property line on more than one occasion because it continued to grow over defendant's property. Bramucci testified that he was aware of the property line's location because, in 2016, he identified a property marker where two fence lines had converged.

¶ 9    Bramucci testified that, in 2016, he had a conversation with defendant during which she broached cutting the neighbor's buckthorn. Bramucci testified that, during this conversation, he told defendant that she would have to discuss the issue with her neighbor. Bramucci testified that, in 2017, he had another conversation with defendant about trimming back the buckthorn, and defendant informed him that she had the neighbor's consent for ATC to complete the project.

¶ 10    Bramucci testified that it was his general practice to inform customers that they need to get their neighbors' consent for any work that would require ATC to go onto a neighbor's property or touch anything on the neighbor's property. According to Bramucci, he always relied on the customer to gain the consent; he would not contact the neighbor himself.

¶ 11    Further, Bramucci testified that, on or about June 4, 2021, he had a telephone conversation with defendant. During the conversation, defendant stated that she was "ready to remove the remainder of the buckthorn." Bramucci said that he understood defendant's request to be for ATC to eradicate the buckthorn from the neighbor's property that would otherwise grow over defendant's property. According to Bramucci, defendant asked that ATC remove a row of buckthorn near the west side of defendant's property from the front of the house to the back tree line, constituting approximately 75 to 80 feet of buckthorn.

¶ 12    On June 6, 2021, an ATC crew removed the buckthorn. Bramucci testified that the removed buckthorn was located on the property of 370 Shenandoah, the property adjacent to defendant's. Bramucci was not present at the time but directed his employees to remove the buckthorn based on defendant's request during their prior conversation. However, Bramucci

testified that he received a communication from defendant directing ATC to stop work until defendant told him otherwise. Accordingly, ATC did not complete the project, which would have included removing the buckthorn stumps. The Village admitted into evidence Village exhibit No. 2, a proposal dated June 4, 2021, and purporting to represent the work order for the removal of the buckthorn at issue.

¶ 13     During cross-examination, Bramucci noted that Village exhibit No. 2 was dated June 4, 2021, but was prepared later. Bramucci testified that there was no written contract with defendant prior to ATC performing the work on June 5, 2021. Bramucci agreed that the address listed on the proposal was 380 Shenandoah Court, *i.e.*, defendant's address.

¶ 14     Bramucci confirmed that he was not present on June 5, 2021, the day ATC employees trimmed the buckthorn, and, therefore, was not an eyewitness to what occurred. Bramucci testified that he had a telephone consultation with defendant to discuss the work to be performed. Bramucci denied that he and defendant were supposed to meet at the property prior to the scheduled performance of the work. When asked why there would be an email confirmation of a meeting, Bramucci stated that, when he scheduled the telephone meeting with defendant, ATC's system would have automatically generated one. Bramucci acknowledged that defendant was unable to personally show him the plants she wanted removed. Further, Bramucci testified that defendant contacted him after ATC removed the buckthorn—either that evening or the next day—and told him that he should not return to the property to complete the work "until I [the defendant] resolve this" and she indicated that the neighbors were unhappy.

¶ 15     Bramucci also answered multiple questions about buckthorn. He testified: (1) buckthorn is an invasive and damaging weed; (2) many villages, including Deerfield, have restrictions on planting buckthorn and are attempting to eradicate it; (3) because buckthorn is deciduous, it drops

foliage and is not an ideal plant to provide privacy; and (4) buckthorn emits a chemical impeding plant growth and killing grass near or under it. Moreover, Bramucci testified that defendant's property had been substantially damaged by her neighbor's buckthorn. He said the buckthorn caused her lawn to flood, no grass was able to grow in areas, and the site was continuously muddy.

¶ 16    Bramucci further testified that he provided all of defendant's invoices to the Deerfield Police Department, he confirmed that there was not a written contract for the work to be performed prior to June 5, 2021, and he agreed that his company also performed work for the Village of Deerfield, which was lucrative for his business.

¶ 17    When shown defense exhibit No. 1, a photograph bearing a date of September 22, 2021, Bramucci testified that the depicted buckthorn appeared to be regrowing.

¶ 18    During redirect examination, Bramucci testified that Village exhibit No. 2 listed defendant's address because she was the customer and was to be billed for the work and that the address does not indicate that ATC's work was limited to defendant's property. Bramucci again testified that defendant hired ATC to remove buckthorn from her neighbor's property and that defendant implied by her request that she had received permission from the neighbor.

¶ 19    The Village next presented Karen DeCicco, who testified that she presently resides in Prairie View, but her family's home was located at 370 Shenandoah Court in Deerfield. DeCicco said she lived in the home from 1965 to 1974, along with her parents and three siblings. According to DeCicco, her father died 30 years earlier, and her mother, Pauline Tanzillo, continued to live in the house. At various times, DeCicco's sister, niece, and a caregiver resided in the home with Pauline until her death on February 14, 2021. In approximately May 2021, the Tanzillo home became vacant, and it remained empty on June 5, 2021. DeCicco stated that she and her siblings inherited the home through a Tanzillo family trust.

¶ 20    DeCicco testified that her father had the northeast corner of the property landscaped in 1966, and the buckthorn was planted at that time. The Village admitted a series of exhibits that purported to show the buckthorn located on 370 Shenandoah Court shortly after it had been planted. DeCicco testified that Village exhibit No. 3 was from a family party in 1965; Village exhibit No. 4 showed DeCicco in approximately 1968 or 1969 with the shrubbery visible behind her on the northeast corner of the property; and Village exhibit No. 5 showed the buckthorn in the backyard of 370 Shenandoah Court. DeCicco circled the area of buckthorn in Village exhibit No. 5 that she said was cut down on June 5, 2021.

¶ 21    The Village next admitted Village exhibits Nos. 6 and 7, which purported to show the condition of the property after ATC removed the buckthorn. DeCicco testified that Village exhibit No. 6 showed the northeast portion of the property as it looked on approximately June 7, 2021. DeCicco testified that the photograph showed "the destruction" of approximately 87 feet of property. DeCicco identified the buckthorn stumps in the photograph as being located on the property of 370 Shenandoah Court. DeCicco testified that Village exhibit No. 7 depicted the same northeast corner of the family property but also showed the approximately six to eight feet of buckthorn bushes that remained.

¶ 22    DeCicco testified that she visited the Tanzillo home a few days per week and was there on June 4, 2021. She testified that neither defendant nor anyone else asked her for permission to remove any of the buckthorn from the property. DeCicco denied that any family member gave defendant permission to remove the buckthorn. After DeCicco learned the buckthorn was cut down, she had her son take photographs of the damage and contacted her brother and the Deerfield police.

¶ 23    DeCicco testified that the family intended to sell the home, but because of the damage to the buckthorn and the pending cases the sale was "on hold."

¶ 24    On cross-examination, DeCicco testified that she was not familiar with defendant and does not believe that they had ever met or spoken before June 7, 2021. Pauline never previously mentioned defendant to DeCicco.

¶ 25    Defense counsel showed DeCicco a series of photographs. DeCicco identified defense exhibit No. 2 as depicting the northeast corner of the Tanzillo home, defense exhibit No. 3 as the houses with a property line, and defense exhibit No. 4 as the west side of "our yard."

¶ 26    DeCicco testified that she wanted the Deerfield police to arrest defendant and that she and her siblings hired a lawyer. DeCicco reviewed defense exhibit No. 5, a letter from the attorney retained to handle a potential claim against defendant and which demanded restitution in the approximate amount of $10,000 for damage caused to the buckthorn. DeCicco acknowledged that defense exhibit No. 3 was included with the attorney's demand letter to defendant, and that it inaccurately depicted the area of the buckthorn removal. DeCicco denied involvement in the photograph's preparation, stating that either her brother or the lawyer was responsible for the mistake.

¶ 27    DeCicco testified that she confronted defendant about the damage to the buckthorn and told her, "I think you're going to have to be arrested." DeCicco also told defendant's daughter that defendant would be arrested if she did not pay the demanded restitution. DeCicco acknowledged that the Village of Deerfield considered buckthorn a weed with no value. DeCicco confirmed that she was not present on June 5, 2021, and was not an eyewitness to the buckthorn's removal. DeCicco stated that the family utilized a landscaping company to, among other things, trim the buckthorn on the 370 Shenandoah Property.

¶ 28     Pasquale Tanzillo testified that he is DeCicco's brother and another heir to the property at 370 Shenandoah Court. Tanzillo testified that he last lived in the family home in 1968, when he moved out to join the army.

¶ 29     Tanzillo testified that he worked as an excavating contractor for approximately 45 years and was familiar with how property lines are designated. According to Tanzillo, property lines are marked using iron pins placed approximately one foot from the public sidewalk. Tanzillo testified that he went to 370 Shenandoah after learning of the property damage to determine the property line. Tanzillo testified that he located the property boundary pins with a metal detector, then used string between the pins to demarcate the property line. Tanzillo testified that the removed buckthorn was located on the property of 370 Shenandoah Court.

¶ 30     Tanzillo reviewed Village exhibit No. 6 and identified it as a photograph of the side of "mom's house" prior to June 5, 2021. The Village then admitted Village exhibits Nos. 6 through 8. Tanzillo testified that the photograph in Village exhibit No. 6 showed the property line between defendant's home and Tanzillo home. Tanzillo identified Village exhibit No. 7 as the reverse view of the property line. Tanzillo testified that Village exhibit No. 8 also was intended to show the line between the two properties. Tanzillo testified that he never gave anyone permission to remove buckthorn from the property.

¶ 31     During cross-examination, Tanzillo testified that he did not have his glasses and was unable to see the string depicted in the photographs. Tanzillo had difficulty seeing the photographs at all. Tanzillo acknowledged that he did not have a formal survey of the property line completed and that the string he used to mark the property line was an approximation. He also stated that he was not present when the buckthorn was removed.

¶ 32    Defense counsel asked Tanzillo about the photographs sent to defendant along with the demand letter.  Tanzillo stated that the family gave several photographs to the lawyer and that, if anything was mislabeled or misrepresented, it was the lawyer's fault.

¶ 33    After the Village rested its case, defendant called Deerfield Police Officer Wesley Carner, who testified remotely via Zoom.  Carner testified that he was involved in the investigation of DeCicco's complaint.

¶ 34    According to Carner, he did not personally witness the events in the case but did have a conversation with DeCicco about the allegations.  Carner testified that he did not cite defendant under a Village tree protection ordinance, because buckthorn is invasive and not a protected species.  Carner also stated that the Village was attempting to remove buckthorn from all Village-owned property and that it was his understanding that buckthorn has "no value."

¶ 35    Carner testified that he consulted with the Village prosecutor, who advised him to charge defendant with criminal damage to property.  In response to defense counsel's question, Carner testified that defendant declined to make a statement about the case.  Carner testified that he suggested to the Tanzillos that they may wish to consult with an attorney or realtor if they wished to further pursue this matter in civil court.  The Village did not cross-examine Carner.

¶ 36    Defendant testified that she had lived at 380 Shenandoah Court for 15 years.  She scheduled an appointment with Bramucci at the property for June 3, 2021, at 6 p.m., so that she could show him the work that ATC was to perform.  Defendant said that Bramucci failed to appear for the appointment.  Defense exhibit No. 7 was admitted, which defendant testified was an email confirmation of the scheduled in-person meeting.

¶ 37    Defendant identified the photograph in defense exhibit No. 2 as one she had taken on June 17, 2021. Defendant stated that the photograph showed buckthorn, some of which was located on her property and some of which was located on the Tanzillo property.

¶ 38    Defendant testified that she received defense exhibit No. 5 and that it demanded payment of $9,999 to the Tanzillos. Defendant also stated that DeCicco followed her and her daughter into her driveway and blocked them in and that DeCicco threatened defendant with arrest if she did not pay the Tanzillos. Defendant testified that an employee of the Tanzillo family also confronted her, saying that defendant should just pay the family so that there would be no further trouble. Defendant stated that, due to their threats and other conduct, she was fearful of the Tanzillo family.

¶ 39    During cross-examination, defendant testified that she first spoke to Pauline Tanzillo in approximately 2007, but that she had never met any of the Tanzillo children. Defendant stated that, until she was charged in this case, she was unaware that Pauline had died. Defendant acknowledged that she did not have permission to remove anything from the Tanzillo property but stated that she did not ask Bramucci to cut down anything that was not on her property.

¶ 40    In argument, the Village contended that it had proven that defendant, without permission, hired ATC to remove buckthorn from the Tanzillo property. In so doing, defendant lied to Bramucci about having consent to remove the buckthorn. The Village also argued that defendant waited until Pauline died and then attempted to have the buckthorn removed.

¶ 41    During the Village's argument, the court asked whether the Municipal Code allowed liability for the conduct of another. The prosecuting attorney stated that it did and that he would attempt to locate the relevant provision.

¶ 42    Defendant made three primary arguments in closing: (1) the Village failed to prove the removed buckthorn was not on defendant's property; (2) assuming the buckthorn was on the

Tanzillo property, its removal was due to error by ATC and not at defendant's request; and (3) defendant could not be guilty of destroying buckthorn, a plant with no value considered a nuisance and targeted for eradication by the Village. Defendant argued that Bramucci was not truthful about the scheduled appointment at defendant's home and that the removal of buckthorn was due to a lack of clarity on Bramucci's part. According to defendant, ATC was only hired to cut the buckthorn that had spread to her yard, and the written proposal containing only her address confirmed this. Because Bramucci stood to lose business with the Village, he was unwilling to acknowledge his error. Further, the Village failed to offer a survey or an expert witness as to the location of the property line. Defense counsel argued that the case was more appropriate for resolution in a civil courtroom than a criminal one.

¶ 43    After hearing argument, the court agreed that the allegations in the case might also have been appropriate for a civil courtroom, but that it was not unusual for cases to be brought in both criminal and civil actions. The court noted that many traffic accidents result in both a traffic citation and a civil complaint.

¶ 44    The court stated that it had reviewed the complaint and the section of the Municipal Code charged in therein. Specifically, the complaint charged defendant with criminal damage to property, in violation of Municipal Code section 15-29.1, in that, on June 5, 2021, defendant knowingly hired ATC to enter upon the property at 370 Shenandoah Court and remove approximately 20 buckthorn plants covering approximately 85 feet of the property line, causing damage to said property, which is owned by the beneficiaries of the Pauline Tanzillo Trust.

¶ 45    Municipal Code section 15-29.1 provides,

"No person shall willfully, maliciously or negligently break, deface, injure or destroy any property within the Village, whether such property is owned by the State, county, Village

or any other governmental body, or owned by any private person." Municipal Code § 15-29.1.

¶ 46    Therefore, the court first found that, on June 5, 2021, the buckthorn ATC cut down was on the property owned by the Tanzillo family trust. The court found that the evidence supported the proposition that the buckthorn was located at 370 Shenandoah Court: the testimony of Tanzillo regarding the property line; Bramucci's testimony that the buckthorn was not on defendant's property and that he believed defendant received the property owner's permission to remove it; and even defendant's own testimony, during which she claimed that ATC cut down the wrong bushes. The court noted that defendant would not have made such a claim had she believed the buckthorn was on her land.

¶ 47    The court also found that defendant intentionally hired ATC to remove the buckthorn, rejecting defendant's claim that the Village failed to prove that she did so. The court stated that it found credible Bramucci's testimony that defendant specifically hired ATC to remove the buckthorn that was located on the Tanzillo property. The court did not find credible defendant's testimony that she only hired the company to perform work on her own property. The court noted that other evidence corroborated Bramucci's version of the events. For example, during defendant's subsequent communication to Bramucci directing ATC to stop work, she never complained that the company had removed the buckthorn in error. Similarly, during the confrontations by the Tanzillo family, defendant did not indicate that the damage was the result of a mistake by the landscaping company. The court stated that the Village was required to prove the allegations by preponderance of the evidence and found that it did so, but the court noted that it might have reached a different determination under the more-exacting standard of beyond a reasonable doubt.

¶ 48    The court also rejected defendant's claim that she had the lawful ability to hire ATC to remove the buckthorn, because it was considered a weed by the Village and targeted for eradication. The court noted the buckthorn was not defendant's and there was no legal authority presented permitting her to damage the plants.

¶ 49    While the court made these factual findings, it did not initially determine whether defendant was guilty of the charged violation.  The court noted that section 15-29.1 did not, on its face, indicate that liability could be predicated on the conduct of another.  The allegation in the complaint was that defendant hired ATC to remove the buckthorn, so, while the damage was requested by defendant, it was not performed by her.  The court informed the parties that they would have time to address the limited legal issue raised by the court: whether defendant could be found liable under the Municipal Code for the acts she commissioned, *i.e.*, whether accountability liability existed for a charge of criminal damage to property under the Municipal Code. The court stated that, while it found that defendant performed the acts alleged in the complaint, if the Municipal Code did not permit liability for the acts of another, then the court would enter a not-guilty verdict.  The court provided each side with an opportunity to submit case law or other authority on the issue and set the case for verdict/ruling.  Later, the court noted that it had raised the question concerning liability for actions of another around 6 p.m., after a long day and after the courtroom staff had already worked past normal hours, and that it and the Village prosecutor did not have the relevant citation at hand.

¶ 50    On February 3, 2022, the court sent an email to the Village prosecutor and defense counsel and copied the clerk. The email stated,

    "Counsel-

Please see the attached provision from the Deerfield Village Ordinances. The parties

should feel free to submit any additional authority they believe is relevant."

Attached to the email was a copy of Municipal Code section 1-17, downloaded from a website

linked to the Village's official website. That provision provided,

"Unlawful or prohibited acts include causing, permitting, concealing. Whenever in this

code any act or omission is made unlawful or prohibited it shall include causing, allowing,

permitting, aiding, abetting, suffering or concealing the fact of such act or omission."

Municipal Code § 1-17.

¶ 51    Thereafter, on February 15, 2022, the court found defendant guilty of the charged

violation.[1] It noted that defendant had submitted materials in response to the court's February 3,

2022, email, but it found defendant's cited authority distinguishable. In sum, the court found that

many of defendant's arguments were untimely, as defendant did not file prior to trial any motions

challenging the ordinance or the non-traffic citation charges. Further, the court rejected

defendant's argument that she was unaware that she was being charged under a theory of liability

premised on ATC's conduct. The court noted that, while the Village did not specify in its

complaint the applicability of section 1-17, the charges specifically described defendant's conduct

as hiring ATC to remove the buckthorn, and at no time during trial did defendant's questioning of

witnesses or argument suggest that she believed she was being charged with personally operating

the tools to remove the buckthorn. "From the beginning of this case in the charging document the

Village alleged that the [d]efendant was liable for the conduct of the landscaping company in

---

[1]A transcribed report of proceedings, as opposed to a bystander's report, was prepared for

the remaining hearings summarized herein.

cutting down the buckthorn." As such, the court found that it was inaccurate to suggest that defendant was not put on notice regarding the Village's theory of liability.

¶ 52 Further, the court rejected defendant's argument that section 1-17 was void for vagueness. It noted that many Illinois and federal accountability provisions contain similar language, without the specific terms being defined, and, because they are terms within the general understanding of the population, the language was not vague.

¶ 53 Next, the court rejected defendant's argument that the complaint failed to include the "willful" mental state required by section 15-29.1. Again, the court noted, the argument was untimely and should have been raised prior to trial. Further, the court continued, the Village alleged in the complaint that defendant committed the conduct "knowingly," which was a higher mental state than that required by section 15-29.1, which also included liability for negligence. "Essentially, the Village set a higher bar for itself than was required and cleared it." In any event, the court continued, "Just for the record, I would note that the evidence that was presented established not only that the [d]efendant negligently or knowingly committed the violation I will find that she willfully did so."

¶ 54 In addition, the court rejected defendant's argument that she could not be found guilty if ATC also committed the offense. The court noted the issue was not directly before it, "[w]hether or not the company and its employees were charged I simply don't know." Moreover, the accountability cases defendant cited were the "opposite" of her situation, because they concerned whether the defendants could be accountable for conduct by another that they did not know was going to occur, where "not only was [defendant] aware of it[,] she hired the company" to commit it.

¶ 55    Finally, the court rejected defendant's argument that she could not be guilty of criminal damage to property, because buckthorn is a plant targeted for eradication.  Citing Municipal Code sections 21-15 and 21-17, the court noted that they concern procedures by which the *Village* can pursue removal of the plants.  "This is not a self[-]help situation where the [d]efendant was granted legal authority to remove those weeds if they were weeds to remove the buckthorn on her own.  Nowhere in the Village ordinances [is] this kind of self[-]help [  ] provided for and therefore it is not a ground to prevent the prosecution here."  The court found that defendant hired ATC to remove the buckthorn and, in doing so, caused damage to property that was not hers (noting that "causing" is a term contained in section 1-17 of the Municipal Code).

¶ 56                    B. Posttrial Motions and Sentencing

¶ 57    Defendant filed posttrial motions, including a memorandum in opposition to restitution.  With respect to the posttrial motion, the court asked whether defendant acknowledged that she was charged with hiring the company that removed the buckthorn.  "Is that your understanding of what the allegation was against your client?"  Defense counsel responded, "As in the complaint, yes, Judge."  Upon further discussion, the court again denied defendant's argument that she was charged as a principal and that the allegations did not charge her with accountability.  In explaining its rationale, the court noted that the complaint specifically charged defendant with hiring ATC to remove the plants, so defendant's cited authority that the theory could not be changed in a manner unfair to a defendant was inapplicable.  "Here[,] in the charging document[,] [defendant] was charged with hiring the company to remove the buckthorn, hiring someone else to commit the offense.  And because of that I do believe she was on notice from the outset that this was an accountability case in the broad sense of the term."

¶ 58    In addition, the court noted that defendant had accused the court of stepping into the role of prosecutor.  It rejected that argument, noting that: the theory was clear from the outset; if anything, by raising the point about which ordinance allowed prosecution on an accountability theory, it had raised a defense argument and was ensuring that the prosecution met its burden based on what was alleged and what was allowable under the ordinance; and although defendant seemed to take issue with the court doing its own research, "[w]henever I had a legal question, I am going to research *** I don't believe it's improper for the [c]ourt to research legal questions, in fact I think it would be improper if I didn't."  The court finally noted again that: it had not found any cases where similar ordinances were stricken for vagueness; while referring to section 1-17 in the charging instrument would have been preferable, the failure to do so here should not result in dismissal of the charge; and, with respect timeliness, while in limited circumstances a posttrial challenge to a charging document may be allowed, the more appropriate time to raise those issues was pretrial, so that they could be addressed.  Finally,

> "As far as the sufficiency of the evidence[,] I found and continue to find that the Village has proven by a preponderance of the evidence[,] which is the standard[,] that [defendant] did hire the company to remove the buckthorn, that she did so willfully[,] and had there been a challenge to the provision prior to trial and the Village amended or filed an updated charge with the willful which was the proper mental state I would continue to find [defendant] guilty."

¶ 59    After denying defendant's posttrial motion, the court proceeded to sentencing.  It rejected the Village's request that defendant pay restitution.  The court agreed with defendant that the ordinance did not provide for restitution and declined to order it as part of the sentence.  Therefore,

it sentenced defendant to six months' supervision, $500 in fines and assessments, and 40 hours of community service. Defendant appeals.

¶ 60                                    II. ANALYSIS

¶ 61     Defendant raises five issues on appeal. First, that she could not be found guilty under the ordinance of destroying property, when the property that was allegedly destroyed was contraband. Second, she argues that she was denied due process where the court *sua sponte* raised accountability as a new theory of guilt after trial. Third, plaintiff argues that section 1-17 of the Municipal Code listed seven different provisions in the disjunctive, and the complaint did not specify which one applied. Fourth, defendant argues that the evidence was insufficient to find her guilty by a preponderance of the evidence. Finally, defendant asserts that the cumulative effect of the errors violated her due process rights. For the following reasons, we disagree and affirm.

¶ 62                            A. Destruction of Contraband

¶ 63     Defendant first argues that the charge against her was unsustainable because buckthorn, the only property that she allegedly damaged, is an invasive species that the Municipal Code considers a nuisance.[2] Further, defendant argues, permitting buckthorn to grow or remain on any

_____

[2]Specifically, defendant cites Municipal Code section 21-15, entitled "Weeds; Nuisance," which lists specific weeds (but *not* buckthorn) and provides that they or,

> "other weeds of a like kind, found growing in any lot or tract of land in the village are hereby declared to be a nuisance, and it shall be unlawful for any person to permit any such weeds to grow or remain on any such place." Municipal Code § 21-15.

Defendant further notes that Municipal Code section 21-22 defines "Rhamnus (Buckthorn)" as,

> "a non-native species *such as seeds, eggs, spores, or other propagules*, whose

lot or tract of land in the Village is unlawful, and the Municipal Code provides that an owner that removes it shall be entitled to a mitigation credit.[3]   Defendant contends that the plant is also considered an invasive weed under State law.[4]   Therefore, she argues that, because the plant is

introduction causes or is likely to cause economic harm, environmental harm, or harm to human health. *** Rhamnus is considered an aggressive species, commonly known as an 'invasive species.' The Buckthorn invades forests, prairies, and savannas in the Midwestern United States and can form dense thickets crowding out native shrubs and understory plants.  It is difficult to eliminate and can regenerate after cutting or burning. This invasive species grows and reproduces rapidly, negatively, impacting wildlife and water quality in the areas in which it is present." (Emphasis added.)  Municipal Code § 21-22.

[3]Municipal Code section 21-34, "Mitigation Credit for the Elimination of Rhamnus (Buckthorn)" states,

> "An *owner* that removes trees in a manner that requires mitigation *** and as part of the removal eliminates an invasive species of Rhamnus (Buckthorn) on the subject property shall be entitled to a credit *** to offset, in whole or in part, any mitigation fees based on the amount of Rhamnus (Buckthorn) eliminated from the property." (Emphasis added.)  Municipal Code § 21-34.

[4]Defendant cites section 10/2 of the Illinois Exotic Weed Act (525 ILCS 10/1 *et seq.* (West 2022), which defines exotic weeds as,

> "***plants not native to North America which, when planted either spread vegetatively or naturalize and degrade natural communities, reduce the value of fish and

illegal, neither the Village nor her neighbor had standing to bring a complaint. Comparing buckthorn to cocaine and heroin, she asserts that, if her neighbors tried to have the Village prosecute defendant for destroying those substances, it would be plainly understood there would have no basis to seek such prosecution and bringing such a charge would have the Village "laughed out of Court and possibly held in contempt." Here, she notes that her neighbors not only possessed an illegal substance, but allowed it to encroach upon her property. Particularly given that the Village encourages the destruction of buckthorn, defendant asserts that she cannot be held accountable for destruction of property that was unlawful to possess. Concluding that there is no legal right to possession of an illegal substance and no enforceable property right, defendant argues that the Village had no right to be in court in the first place. As such, defendant asks that we reverse the judgment and dismiss the charge as unstainable as a matter of law.

¶ 64    Defendant asserts that this issue, *i.e.*, whether she can be found guilty of destroying something that is contraband, requires us to simply interpret the ordinances, requiring *de novo* review. See, *e.g.*, *Majid v. Retirement Board of Policemen's Annuity & Benefit Fund of City of Chicago*, 2015 IL App (1st) 132182, ¶ 13. The Village disagrees, noting that salient facts were disputed and, thus, because the issue is neither a pure question of fact or law, we review it under

---

wildlife habitat, or threaten an Illinois endangered or threatened species." See 525 ILCS 10/2 (West 2022).

Further, section 10/3 includes buckthorn as an example of an exotic weed. See 525 ILCS 10/3 (West 2022). Finally, defendant notes that, under section 10/4(a) of the Illinois Exotic Weed Act, it is unlawful for any person to "buy, sell, offer for sale, distribute or plant seeds, plants or plant parts of exotic weeds without a permit ***." See 525 ILCS 10/4(a) (West 2022).

the clearly-erroneous standard, reversing only if we are left with a definite and firm conviction that a mistake has been made. See, *e.g.*, *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369 (2002). Here, we conclude that reversal is not warranted under either standard.

¶ 65 Specifically, although defendant argues that her neighbors had no standing to bring a complaint, the complaint at issue here was prosecuted by the Village, which had standing to pursue enforcement of its own ordinance. Again, section 29.1 provided,

> "No person shall willfully, maliciously or negligently break, deface, *injure or destroy any property* within the Village, whether such property is owned by the State, county, Village or any other governmental body, *or owned by any private person*." (Emphases added.) Municipal Code § 29.1.

¶ 66 Defendant's argument focuses on the type of property destroyed, but none of the local and State provisions she cites specifically identify buckthorn as *illegal* contraband, a nuisance, or even specifically establish that buckthorn is a "weed of like kind" to those identified as a nuisance that are unlawful to maintain (see, *e.g.*, section 21-15). Without question, the evidence established that buckthorn is a weed and that the Village seeks to eradicate it; but the provisions cited do not specifically establish its illegality. More importantly, the provisions defendant cites do not in any way support the notion that a private actor may destroy buckthorn or "contraband" on another person's property. Simply put, the buckthorn at issue here still constituted property of another: it was not defendant's to destroy. As the court noted, nothing about the characterization of buckthorn as an invasive species or the fact that *owners* who eliminate it may receive a mitigation credit, suggests that defendant therefore had the authority to destroy someone else's buckthorn. The

ordinances cited simply do not countenance one property owner deciding the worth of another owner's property and taking unauthorized steps to destroy it.

¶ 67    Defendant asserts that she is not arguing that the statutes entitle her to "self-help" but, rather, that they establish buckthorn is contraband that is no different than an illegal narcotic and, "[w]hile nothing specifically entitles [defendant] to self-help to destroy it, it also is not a crime to destroy an illegal substance." She contends that there is no legal basis to prosecute the deprivation of property where the property was illegal in the first place. However, the cases that defendant cites for the proposition that the Village may not "prosecute someone for destroying someone else's property that is illegal" do not stand for that proposition. Specifically, defendant cites *People v. Moore*, 410 Ill. 241, 247 (1951), *Tranchita v. Dep't of Natural Resources*, 2020 IL App (1st) 191251, ¶ 17, *People v. Fratto*, 32 Ill. App. 2d 354 (1961), and *People v. Wrest*, 345 Ill. App. 186 (1951), for the proposition that a person may not assert legal ownership or a right to possession of property that is contraband. However, in those cases, the party that seized the "contraband" was a government actor, and the issue was whether, for example, the property was, in fact, contraband such that the *owner* had a claim for its return. Here, the *Village* prosecuted its own ordinance because *defendant* was acting as a private citizen to destroy buckthorn on the property of another.

¶ 68    In sum, we reject defendant's claim that the charge against her was unsustainable as a matter of law because of the nature of the substance destroyed.

¶ 69                    B. Accountability Raised After Trial

¶ 70    Next, defendant argues that her due process rights were violated where, although she was charged as a principal with violating Municipal Code section 15-29.1, a section which does not expressly provide for accountability liability, the court then assisted the Village by conducting its own research and finding Municipal Code section 1-17, which presented a theory of liability upon

which the Village could proceed. Defendant argues that, even if we do not find improper the court's decision to conduct research on a theory of prosecution that it, itself, had raised, the court erred in concluding that the evidence and argument at trial sufficiently put her on notice of what she was charged with, when that was the "duty of the charging instrument." She argues that, even if the complaint apprised her of the fact that she hired someone to conduct the work, it still charged her under a substantive section that made no reference to section 1-17 or accountability. Defendant asserts that, at trial, she knew that her actions, as alleged, did not amount to a violation under the section she was charged with and was never advised that the "Village was proceeding under the Accountability Section under 1-17 *** since the Village was unaware of the provision[']s existence until the [t]rial [c]ourt brought it up." Defendant concludes that, if charged on an accountability theory, due process requires that she be informed of the correct section under which she is being charged.

¶ 71 Procedural due process is guaranteed by the United States and Illinois Constitutions. *People v. Bradley*, 2017 IL App (4th) 150527, ¶ 15 (citing U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. 1, § 2). Due process is satisfied when a party receives a hearing with adequate notice of the charges and an opportunity to be heard. *Reichert v. Court of Claims of State of Illinois*, 203 Ill. 2d 257, 261 (2003). We review *de novo* a due process claim. *Bradley*, 2017 IL App (4th) 150527, ¶ 13.

¶ 72 Here, we cannot conclude that defendant lacked notice of the charges against her or an opportunity to be heard. The complaint charged defendant with violating Municipal Code section 15-29.1, where she hired ATC to remove her neighbor's buckthorn. Section 15-29.1 is the specific offense with which defendant was charged, but the complaint clearly charged her with violating it by hiring someone else to remove the buckthorn. Section 1-17, in itself, does not define an

unlawful or prohibited act so much as it serves as a global provision that expressly allows liability under *any* Municipal Code provision if an actor, for example, "caused" the violation to occur. As such, even if not specified in the complaint here, defendant was charged with the only provision she allegedly violated, *i.e.*, section 15-29.1, and section 1-17 simply allowed her to be charged with causing the violation by hiring ATC to remove the buckthorn. Accordingly, despite her attempts to argue to the contrary, the complaint clearly put defendant on notice concerning the theory of liability against her.

¶ 73    The cases upon which defendant relies are distinguishable. In both *People v. Millsap*, 189 Ill. 2d 155 (2000), and *People v. Laabs*, 2011 IL App (3d) 090913, ¶ 22, the criminal defendants were charged as principals, and, then, the juries were instructed on a new theory of guilt, accountability, after deliberations had begun. Here, at the outset, the complaint charged defendant with violating the Municipal Code by hiring someone else to take action that caused damage to property. Similarly, in *People v. Panozzo*, 2022 IL App (3d) 190499, ¶ 49, at a jury instruction conference, the State for the first time indicated that it was pursuing three separate acts as independent violations of a no-stalking order, as opposed to the one charged in the information. Here, unlike in *Panozzo*, where the defendant was not provided with adequate notice of the number of acts the State was pursuing, defendant here was always charged with one violation and that did not change. Defendant was provided with the opportunity to present evidence and argue whether, in fact, she hired ATC to take down her neighbor's buckthorn. She did so, before the court raised the accountability question. As such, even if the complaint had specifically referenced section 1-17, defendant has not explained what other argument or evidence she would or could have presented. In sum, defendant has not demonstrated that she was denied due process or was prejudiced.

¶ 74    We further reject defendant's contention that the trial court acted improperly by raising the issue of accountability or conducting independent research.  First, although defendant suggests that the Village was completely unaware of authority allowing defendant to be liable for acts ATC performed and that, instead, it simply leaped at an opportunity the court presented on its behalf, in fact, the bystander's report reflects that, when the court asked whether the Municipal Code allowed liability for the conduct of another, the prosecuting attorney answered that "*it did*, and that he would attempt to locate the relevant provision."  (Emphasis added.)  Defendant's omission of this critical portion of the quotation from the bystander's report is, we can only presume, an attempt to intentionally mislead this court.  The Village was not aware of the provision solely because the court brought it to the Village's attention; rather, the Village understood that the authority existed, but did not have the citation at hand.

¶ 75    Second, and as noted by the trial court, there is nothing inherently partial about the court's efforts to confirm that prosecution was proper.  The record reflects that the court raised the question before both parties around 6 p.m., after a long day and after the courtroom staff had already worked past normal hours, and it and the Village prosecutor simply did not have the relevant citation at their fingertips.  The court later located the provision, emailed it to both parties, and gave them an opportunity to submit any additional provisions or authority desired.  Thus, although defendant seeks to portray the court as an advocate for the Village, the record before us instead reflects the court simply confirming the particulars of the Village's authority to pursue the theory that was charged in the complaint.  If anything, raising the issue could have benefitted defendant, who had not previously moved for dismissal or argued that prosecution under an accountability theory as improper.  This series of events simply does not reflect a changed theory of liability or improper advocacy by the court.

¶ 76    Finally, the only cases defendant cites to suggest that the court erred in conducting research and locating the relevant provision concern the concept that, where a party does not develop an argument, an appellate court will not research and argue the point on its behalf.  See *e.g.*, *In re Estate of Divine*, 263 Ill. App. 3d 799, 809 (1994) (citing *Nicholl v. Scaletta*, 104 Ill. App. 3d 642 (1982)).  While defendant is correct that *Divine* noted that both trial and appellate courts must take the case as it is presented to them (*Divine*, 263 Ill. App. 3d at 809), the context again was the propriety of raising issues or arguments not presented by the parties.  Ironically, defendant challenges that the trial court raised an issue that might have benefitted *defendant*; in the end, it did not, but the cited cases simply do not reflect that the trial court engaged in improper advocacy here.

¶ 77    In sum, we reject defendant's argument that she was charged with one theory of liability and then ambushed with another.  In fact, the complaint always charged her with a violation of section 15-29.1 based on a theory of liability authorized by section 1-17.

¶ 78                              C. Municipal Code Section 1-17

¶ 79    Next, defendant argues that Municipal Code section 1-17 lists seven disjunctives that suffice to establish liability, but the complaint did not specify which one she was charged with violating.  Again, section 1-17 provides, "Whenever in this code any act or omission is made unlawful or prohibited it shall include causing, allowing, permitting, aiding, abetting, suffering or concealing the fact of such act or omission."  Municipal Code § 1-17.  As such, defendant asserts that, even if properly charged, there was vast uncertainty in determining which language she would have had to prepare to defend against, and she could not prepare a defense after the trial court "constructively amended the complaint" following the close of evidence. Defendant further asserts that "causing" the hiring of ATC to remove the buckthorn is not the same as "allowing" ATC to

do so. She notes that, although raised posttrial, the court addressed only the lack of definitions in the section and not her argument that she did not know which of the different theories she was being charged with. Finally, defendant argues that she could not have raised the issue pretrial because section 1-17 was first raised after trial. "Defendant could not possibly have raised a challenge to a section that neither party including the Village, who brought the charge, knew existed."

¶ 80    As previously noted, procedural due process is satisfied when a party receives a hearing with adequate notice of the charges and an opportunity to be heard. *Reichert*, 203 Ill. 2d at 261. We review *de novo* a due process claim. *Bradley*, 2017 IL App (4th) 150527, ¶ 13.

¶ 81    Again, we reject defendant's argument. A charging instrument is insufficient only if the disjunctive creates uncertainty as to the charges against the defendant and prevents the defendant from preparing a defense thereto. See, *e.g.*, *People v. Bergeson*, 255 Ill. App. 3d 601, 603 (1994). Here, the complaint charged that defendant violated section 15-29.1 in that she,

> "*knowingly hired* Advanced Tree Care to enter upon the property at 370 Shenandoah Court and remove approximately 20 Buckthorn plants covering approximately 85 feet of the property line, *causing* damage to said property, which is owned by the beneficiaries of the Pauline Tanzillo Trust." (Emphases added.)

¶ 82    Thus, the complaint's descriptions of "knowingly hiring" ATC to remove the buckthorn and "causing damage" to the property, which were not used in the disjunctive, specifically described the charge against defendant of criminal damage to property in section 15-29.1. The disjunctive of which defendant presently complains appears in section 1-17's description of how unlawful or prohibited acts under the Municipal Code include causing, permitting, concealing, etc. those acts. Thus, the *complaint* was not uncertain as to the charge of criminal damage to property

against defendant. As such, she suggests that section 1-17's use of disjunctive terms renders uncertain which actions she took under that section. Again, we disagree. We note that the complaint used the term "causing," which is a verb specified in section 1-17. Further, "knowingly hiring" ATC to remove the buckthorn is sufficiently akin to "causing," such that we are not convinced that section 1-17, particularly when read in conjunction with the complaint, caused such uncertainty that defendant lacked notice of the charge against her or was at all prejudiced in preparing a defense.

¶ 83     Defendant's reliance on *People v. Heard*, 47 Ill. 2d 501, 504-05 (1970), is misplaced. There, the disjunctive terms were manners of charging the *offense* itself. For example, in *Heard*, the charging instrument charged the defendants in disjunctive terms with gambling by "having set up a policy game or promoted a policy game or sold tickets," etc.[5] The court noted,

> "While a charge which follows the language of the statute defining the crime and
> uses the disjunctive 'or' will be sufficient under some circumstances, it will not be
> sufficient where the statute names disparate and alternative acts, any one of which will
> constitute the offense. The statute here named specific acts which constitute the crime of
> gambling, some of which acts are clearly disparate and alternative. The promoting of a
> policy game is not the same act as transferring a policy ticket, for example. The use of the

---

[5]Specifically, the instrument charged that the defendants,

"set up or promoted a Policy Game or (Sold) or (Offered to Sell) or (transferred) a ticket or (share) for a lottery or (sold) or (offered to sell) or (transferred) or (knowingly possessed) a policy ticket or other similar device: To Wit: Policy results tickets, Policy bet writings and other related gambling policy paraphernalia." *Heard*, 47 Ill. 2d at 504.

disjunctive under these circumstances causes uncertainty and conjecture as to which of the alternatives the accused is charged with committing." (Internal citations omitted.) *Heard*, 47 Ill. 2d at 504-05.

¶ 84 Similarly, in *Bergeson*, this court noted that, for certain offenses that can be committed in a variety of ways, a charging instrument merely parroting the language of the statute is insufficient because a wide variety of conduct might be included. *Bergeson*, 255 Ill. App. 3d at 603. However, where a complaint does more than merely charge in the language of the statute, it may sufficiently inform a defendant of the specific conduct charged to allow for preparation of a defense. *Id.*

¶ 85 Again, here, the complaint did not simply parrot language from the Municipal Code. Rather, it specified precisely that defendant was charged with criminal damage to property based upon knowingly hiring ATC to remove buckthorn on specific property owned by another and causing damage to that property. In sum, we reject the argument that section 1-17's disjunctive terms violated her right to due process.

¶ 86                                    D. Sufficiency of the Evidence

¶ 87 Defendant next argues that there was insufficient evidence to find her guilty on an accountability theory. Defendant notes that she testified that she did not ask Bramucci to cut down anything on the Tanzillo property, and the court's failure to find her credible is against the manifest weight of the evidence. Specifically, defendant points out that Bramucci's interpretation of her statement to him—that she was ready to remove the remainder of the buckthorn—as meaning that she wanted him to remove the buckthorn from the Tanzillo property was vague, was only his interpretation, and was not supported by the invoice, which lists work only on defendant's property. In addition, defendant notes that no evidence concerning property lines was introduced to established that the buckthorn was cut from the Tanzillo property, and only uncorroborated

testimony and speculation was introduced to establish even by a preponderance of the evidence that defendant cut buckthorn from that property.

¶ 88    A municipality's action to enforce an ordinance is quasi-criminal but is "tried and reviewed as a civil proceeding." *Village of Plainfield v. American Cedar Designs, Inc.*, 316 Ill. App. 3d 130, 135 (2000). An ordinance violation must be proved by a preponderance of the evidence, meaning it is more likely than not that the violation occurred. Ill. S. Ct. R. 578 (eff. Dec. 7, 2011); *City of Peoria v. Heim*, 229 Ill. App. 3d 1016, 1017 (1992). We consider on appeal whether the trial court's judgment was against the manifest weight of the evidence. *County of Kankakee v. Anthony*, 304 Ill. App. 3d 1040, 1048 (1999). A decision is against the manifest weight of the evidence when the opposite conclusion is apparent, or the court's findings are unreasonable. See, *e.g.*, *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 89    Here, the court's conclusion that the Village proved defendant's ordinance violation by a preponderance of the evidence was not unreasonable. Specifically, although defendant takes issue with the court's decision to find Bramucci credible, such credibility findings are specifically in the realm of the finder of fact. Indeed, in a bench trial, it is the job of the trial judge, sitting as the factfinder, to make determinations about witness credibility and those determinations are entitled to great deference. See, *e.g.*, *People v. Siguenza-Brito*, 235 Ill.2d 213, 224 (2009). Defendant contends that Bramucci's testimony was unsupported, because the invoice listed only her property address. However, the court could have reasonably found that only defendant's address was listed because she was, in fact, the client being billed for the work that ATC performed. Moreover, the court could have reasonably credited Bramucci's interpretation of defendant's request, given that she had been his client for several years, they had multiple conversations concerning the buckthorn, ATC had performed trimming and other work on the buckthorn more than once, and

they had previously discussed removing it and obtaining permission from the neighbor before doing so. Defendant notes that Bramucci's work for the Village provided him incentive to protect ATC for its own mistakes, but the court was aware of this potential bias before ruling. We also note that Bramucci testified that the buckthorn damaged defendant's property and he explained how it created muddy conditions and dead areas on her yard, which the court could have found enhanced Bramucci's credibility as a balanced and honest witness. As such, we cannot find unreasonable the court's decision to find Bramucci credible.

¶ 90     Further, we disagree with defendant that the court's finding that the removed buckthorn was on the Tanzillo property was against the manifest weight of the evidence. First, the court credited Tanzillo's testimony that he, an excavating contractor for approximately 45 years and familiar with property lines, located the property boundary pins with a metal detector and then used string between the pins to demarcate the property line. Tanzillo testified that the removed buckthorn was located on the Tanzillo property. Second, the court found that, because defendant testified that ATC removed the wrong bushes, she effectively conceded that they were not on her property. Third, according to the trial court, when defendant communicated to Bramucci to stop the work because the neighbors were upset, she did not complain to him that the company had removed the wrong bushes, nor tell the Tanzillo family that ATC had made a mistake. In her reply brief, defendant notes that the bystander's report does not indicate whether she was ever asked questions along those lines or what her responses were, but that she *did* testify that she was scared of the Tanzillos, which might explain why she did not engage in conversation with them, and that she had asked Bramucci to stop the work. And while "no reason was given" for why she asked Bramucci to stop, defendant asserts that she was not required to give one. She continues, "if she had hired and paid Bramucci to remove buckthorn, even though she did not communicate a reason

to him, there must have been a reason she asked him to stop," and she then surmises that the reason could have been that she learned her neighbor's property had been compromised. Yet, it was for the trial court, not this appellate court, to decide the weight to give the evidence and any inferences to be derived therefrom. See *e.g.*, *People v. Nelson*, 246 Ill. App. 3d 824, 832 (1993) ("particularly in a bench trial, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence" and it "may accept or reject as much of the testimony as it wishes and draw reasonable inferences therefrom." Notably, it "is not required to believe the defendant's testimony.")

¶ 91    Moreover, and again, the ordinance violation needed to be established by only a preponderance of the evidence, *i.e.*, that it more likely than not occurred, *not* by the more stringent beyond-a-reasonable-doubt standard, which the court here acknowledged might have required another conclusion. The court's determination that the evidence rendered it more likely than not that defendant knowingly and willfully hired ATC to remove the buckthorn from the Tanzillo property was not unreasonable. Other than her own testimony, the fact that the invoice reasonably lists only her address on it, and her challenges to Bramucci's testimony, which we have rejected, defendant offers no affirmative evidence that would render the court's decision as being against the manifest weight of the evidence. In sum, we disagree with defendant that the court's finding that the Village established its case by a preponderance of the evidence was erroneous.

¶ 92                                    E. Cumulative Error

¶ 93    Finally, defendant argues that, based upon the cumulative effect of the several errors raised on appeal, this court cannot be confident that defendant received a fair trial. She notes that her conviction leads to an absurd result, where she was convicted of destroying unlawful contraband

to which her neighbor had no valid property right. Defendant concludes that the pervasive pattern of errors and prejudice requires that we reverse her conviction or remand for a new trial.

¶ 94    When considering whether a defendant was deprived of a fair trial due to cumulative error, we must consider whether a substantial right was affected "to such a degree that [we] cannot confidently state that defendant's trial was fundamentally fair." *People v. Blue*, 189 Ill. 2d 99, 138 (2000).

¶ 95    Here, we have rejected defendant's arguments and have not found error. As such, there can be no cumulative error.

¶ 96                                III. CONCLUSION

¶ 97    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 98    Affirmed.